STATE of Missouri, Respondent,

v.

Charles W. ARMENTROUT,
III, Appellant.

No. SC 80717.

Supreme Court of Missouri,
En Banc.

Dec. 21, 1999.

As Modified on Denial of Rehearing
Jan. 25, 2000.

John W. Simon, Jefferson City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

STEPHEN N. LIMBAUGH, Jr., Judge.

Appellant Charles W. Armentrout, III was convicted by a jury in the St. Louis City Circuit Court of murder in the first degree, robbery in the first degree, and two counts of armed criminal action. The trial court sentenced Appellant to death for murder in the first degree and to three consecutive life sentences for the other offenses. Because the death penalty was imposed, this Court has exclusive jurisdiction of the appeal. Mo. CONST. art. V, sec. 3. The judgment is affirmed.

## FACTS

The facts, which this Court reviews in the light most favorable to the verdict, *State v. Barton,* 998 S.W.2d 19, 21 (Mo. banc 1999), are as follows:

Appellant was released from prison in August of 1994, having served time for several armed robberies. The members of Appellant's family, with one exception, would not take him into their homes. The exception was Appellant's eighty-one year old grandmother, Inez Notter, who became Appellant's victim. After Appellant moved in with Mrs. Notter, he spent his time with friends getting high on drugs and "scamming" to get money for more drugs. Mrs. Notter was frequently the target of these scams. In most instances, Appellant requested money for a fictitious friend who supposedly needed help, and Mrs. Notter would write Appellant a check for that purpose.

In December of 1994, Appellant began forging Mrs. Notter's name on her checks to obtain cash. Employees at the bank where Mrs. Notter had her checking account soon became suspicious about these checks, and one of the bank managers notified Mrs. Notter about the problem. After reviewing the account herself, Mrs. Notter became very upset that a large sum of money was missing.

On February 20, 1995, Appellant attempted to cash another forged check on his grandmother's account, and bank employees called the police. After the police arrived, they detained Appellant and determined that he had stolen the check from Mrs. Notter's checkbook. Mrs. Notter, however, told the police she did not want to prosecute. The next day, Mrs. Notter went to the bank, and the bank manager tried to persuade her to sign a forgery affidavit, which indicated that she would prosecute Appellant in exchange for

the bank reimbursing her missing funds. Although Mrs. Notter continued to be very upset about the missing funds, she still refused to prosecute and explained to the bank manager that she was afraid of Appellant and that she thought he would kill her if she did not continue to allow him to take money from her account.

On March 18, 1995, at about 11:00 a.m., Appellant and a friend, Rick Lacy, went to Mrs. Notter's house needing money for drugs. Acting together, they beat Mrs. Notter to death with a souvenir baseball bat. She died from massive depressed skull fractures caused by being struck some 12 times with the bat. She also suffered a fracture of the lower jaw, and eight fractured ribs on the left side of her body, which appeared to have been caused by someone stomping on her. She had "defensive type wounds" on her left hand and left upper arm. In addition, both bones in her lower right leg were fractured, although this occurred after her death, apparently in connection with the disposal of her body. To dispose of the body, Appellant tied Mrs. Notter's ankles together with a yellow cord, and wrapped her body in a blanket and comforter that he secured with a brown extension cord. He then stuffed her body into a trunk in her basement.

At about 6:00 p.m., Bridget Joseph, who was Appellant's girlfriend, and Roger Brannon picked up Appellant at Mrs. Notter's house. As he came out of the house, he was carrying two large bags of gifts for Ms. Joseph and told her that his grandmother had been doing spring cleaning and wanted her to have some things that were no longer needed. Appellant also had taken $100 from his grandmother's dresser, which he used to purchase cocaine.

After spending the night with Ms. Joseph at her grandfather's house, Appellant told her he was going back to Mrs. Notter's house to see if he could get more money. On his return to the house, he cleaned the walls and the ceiling of his grandmother's bedroom where the killing took place and also cleaned the souvenir baseball bat, and he then threw away any items that had blood on them.

The next day, March 20, 1995, Appellant made several unsuccessful attempts to cash forged checks on Mrs. Notter's account. At about 2:30 p.m., a bank employee called the police to report that Appellant and a friend, Shirley Mendez, had just made a final attempt to cash a forged check at the bank's drive-through window. The police arrested Ms. Mendez, but Appellant fled before he, too, could be arrested.

On the morning of March 21, 1995, law enforcement officers found Mrs. Notter's body in the trunk in her basement. In her bedroom, they found many bloodstains that were consistent with her DNA profile. In Appellant's bedroom, the officers found the souvenir baseball bat that had been used in the murder and noticed that blood and hair were embedded in cracks of the baseball bat. The DNA profile of the blood on the bat was consistent with Mrs. Notter's genetic profile.

At about 11:30 p.m., police officers who were searching for Appellant arrived at Rick Lacy's house. As one of the officers approached the front door, Rick Lacy came out of the house and told the officer that Appellant was inside. The officer then looked through the front window and saw Appellant get out of a chair, run to the back of the house and jump out a window. Several officers chased Appellant and caught him in the backyard where they arrested him and informed him of his *Miranda* rights.

Appellant was transported to the homicide office and was informed again of his *Miranda* rights. After indicating that he understood his rights and that he was aware of them through his involvement in paralegal studies, he made an oral statement concerning the murder. He was then taken to a television studio at the St. Louis City Police Department where he

was informed again of his *Miranda* rights, signed a *Miranda* waiver form, and agreed to a videotaped interview.

In the videotaped statement, he related that and he and Rick Lacy discussed how to knock Mrs. Notter unconscious and steal her checkbook and that he suggested that they use his Cardinal World Series souvenir baseball bat as a weapon. Appellant claimed that Lacy beat the victim with the bat while Appellant put a chair and a nightstand on her to hold her down. Appellant then described how he and Shirley Mendez tried to cash one of Mrs. Notter's checks and how he returned to the crime scene the next day to clean up the house and dispose of the body. He also described the items he stole from Mrs. Notter and his further efforts to cash forged checks.

On September 8, 1995, after the state had charged Appellant with murder in the first degree, robbery in the first degree and the other offenses, Appellant filed a written motion to waive his right to counsel and to represent himself with the assistance of "standby" counsel. On February 15 and March 4, 1996, Appellant filed second and third motions for waiver of appointed counsel, although the motions made no reference to standby counsel. The trial court held a hearing on the motions on March 4, 1996. After the court explained to Appellant the dangers of self-representation, Appellant indicated again that he wanted to represent himself with the assistance of standby counsel, and the trial court ordered that he could proceed *pro se* and that counsel from the public defender's office would assist him on request.

On September 16, 1996, Appellant and another prisoner escaped from the city jail by sawing the bars in their cell. They were soon captured a few miles from the jail.

In January 1997, Appellant filed a motion for an order requiring the public defender's office to provide "funds for depositions, investigative services, expert services and other preparatory activities services." On April 16, 1997, despite rigorous opposition by the public defender's office, the trial court sustained the motion in part and ordered the office to provide the expenses for services necessary to taking depositions. Thereafter, the Public Defender Commission filed a petition for a writ of prohibition in the Court of Appeals, Eastern District, to compel the trial court to rescind its April 16 order. Although the Court of Appeals denied the petition, the public defender's office continued to refuse funding for Appellant's expenses unless its lawyers were appointed as lead counsel. At a hearing on October 27, 1997, Appellant's appointed standby counsel explained that they were having trouble obtaining experts who would work with a defendant representing himself, and in response, Appellant suggested that appointed counsel should handle expert matters. On November 10, 1997, at yet another hearing, Appellant's appointed counsel indicated that they were now willing to assist Appellant with funding and expenses, and Appellant reiterated that he wanted at least limited assistance from counsel. A few days later, Appellant complained that he was forced to choose between adequate funding and the right to represent himself because the public defender's office had initially withheld that funding. However, when Appellant was questioned as to whether he wanted appointed counsel to handle expert matters, Appellant stated once again that he wanted them to do so.

Trial commenced on January 26, 1998. Appellant did not testify on his own behalf, nor did he present any guilt-phase evidence. The jury found Appellant guilty on all charges, found the existence of five aggravating circumstances, and recommended the death penalty for murder in the first degree. As noted, the trial court sentenced Appellant to death on the murder charge and to three consecutive life sentences on the other offenses.

## I.

Appellant's principal claim is that he was denied the right to represent himself, and he contends that this right was denied in three different respects.

### A.

First, Appellant argues that the he was forced to relinquish one constitutional right – the right to complete self-representation – in order to exercise another – the right to have the basic tools of a defense. He explains that he would not have agreed to standby or hybrid counsel if the public defender's office had not refused to provide him with funds for depositions and expert witnesses until just two weeks before the case was first set for trial.

 In *Faretta v. California*, 422 U.S. 806, 818–20, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that the Sixth Amendment of the Constitution guarantees the accused in a criminal prosecution the right to self-representation in lieu of the right to assistance of counsel. In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that the Sixth Amendment right to counsel also encompasses "the basic tools for an adequate defense," that must "be provided to those defendants who cannot afford to pay for them." *Id.* at 77, 105 S.Ct. 1087. The state may not require a defendant to relinquish one of two procedural rights in order to obtain the protection of the other. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

 In this case, it is clear that Appellant had the right to represent himself under *Faretta*, but it is not at all clear that *Ake* required state funding for all the depositions and experts Appellant requested, or that *Ake* (which involved a defendant represented by counsel) requires any funding whatsoever where a defendant chooses to represent himself. It is unnecessary to address these particular applications of *Ake*, however, because even if funding was required, the record shows conclusively that Appellant was not forced to relinquish his right to self-representation in order to obtain that funding.

As noted, Appellant repeatedly stated that he wished to have standby counsel to assist him if necessary. These requests were not tied to the funding issue. During one of the hearings, Appellant put it this way:

THE DEFENDANT [APPELLANT]: Well, as I understand it Missouri case law provides for hybrid representation if the Court so desires to order such. And it would be—it would be totally ridiculous for me to sit here and waive any right to ineffective (sic) assistance of counsel or stand-by counsel, I'm not going to do that and I'm not going to be put in that position.

In addition, Appellant agreed that hybrid counsel should take over matters pertaining to expert witnesses. This occurred when his appointed standby counsel explained to him that they were having trouble obtaining a DNA expert who was willing to work with a defendant representing himself. The relevant part of the transcript is as follows:

THE COURT: All right. You realize of course nobody can make an expert do anything they don't want to do?

THE DEFENDANT: I realize that and I also know that the Court has indicated a couple of times, I don't know whether it was through passing, that stand-by counsel could, how would I say it, be in a role of like hybrid representation in that they would conduct the certain areas relating to experts.

THE COURT: You are right about that, I hadn't even thought about that.

THE DEFENDANT: So if that's the case and the Court is so inclined to it that I would not object to stand-by counsel making the arrangements and preparing for those phases of trial.

THE COURT: Okay, with respect to all the experts or just DNA experts?

THE DEFENDANT: All the experts would be fine, I have no objection.

Appellant later indicated that he also wanted assistance of counsel during voir dire. While the trial court was discussing how voir dire would be handled, the following discussion took place:

THE COURT: Are you going to have your lawyer do some questions, your stand-by counsel?

THE DEFENDANT: I hadn't planned on it unless they felt there was an area that they needed to say something I was going to request that they do that but I don't see –

THE COURT: What do you mean? Are just going to turn to them at some point and say look, if you have any questions that you think ought to be asked go ahead and ask them?

THE DEFENDANT: Basically, yes.

\* \* \*

THE DEFENDANT: Excuse me, no, not that they would stand up and do the voir dire, I would ask them if there was any questions and if they felt there were they would advise me and I would ask the question.

In light of these discussions, Appellant's claim that he agreed to standby and/or hybrid counsel solely to obtain funding for depositions and experts is disingenuous. He was not forced to choose one constitutional right over the other, but made that choice on his own volition, apparently as a matter of judgment and trial strategy. The point is denied.

### B.

■ As this Court understands the next point, the trial court not only denied Appellant's right to self-representation by refusing to order funding for litigation expenses without the appointment of public defenders, as addressed in Part I. A, but also by appointing public defenders who had a conflict of interest in representing Appellant. The public defenders, as Appellant explains, did not give him their undivided loyalty because they objected to the funding for litigation expenses "throughout the bulk of the proceedings." The record shows, however, that any conflict was resolved when the public defender's office agreed to provide funding for litigation services. There is no evidence that once the funding issue was settled that the public defenders failed to give Appellant their undivided loyalty or that they failed to act diligently on his behalf. The point is denied.

### C.

■ Appellant also alleges that he was denied his right to self-representation because he was not present at two conferences the trial court held with counsel. The first conference, on June 12, 1997, was held in chambers between the trial court and Dan Gralike, the deputy director of the public defender's office. At this meeting, Gralike told the court that the public defender's office would again petition for a writ of prohibition to prevent the trial court from ordering the office to pay for Appellant's depositions and expert services. The court told Gralike that he did not think that would be easy considering the first attempt at a writ had failed. The court also told Gralike that the public defender's office was to continue working on the case.

This claim is governed by the Supreme Court's decision in *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), in which the Court explained that, under *Faretta*, the relevant inquiry is whether the defendant's control over the case was impaired. Appellant relies particularly on *Oses v. Commonwealth of Massachusetts*, 775 F.Supp. 443 (D.Mass.1991), aff'd, 961 F.2d 985 (1st Cir. 1992), which applied *McKaskle* in holding that ex parte conferences diminished a defendant's control over the case and violated defendant's right to self-representation. *Oses*, however, is distinguishable. There, the trial court barred defendant, who was

*pro se,* from participating in more than 70 sidebar conferences during trial. *Id.* at 458. In contrast, the June 12 meeting did not diminish Appellant's control over his case in any significant way. Although the *ex parte* contact appears to have been improper (the public defender's office should not have argued against Appellant's interests without Appellant being present, see Rule 2, Canon 3B(7)), the trial court continued to rule the funding issue in Appellant's favor. Having prevailed on the issue in controversy, it makes no sense that Appellant somehow lost control over the case.

■ The second conference, held on October 31, 1997, took place several days after Appellant agreed that his counsel should handle all of the expert services and testimony. At the conference, which was actually an informal hearing, Appellant's counsel, the prosecutor, and the trial court discussed expert and scientific matters in order for the court to determine whether a continuance was necessary to afford Appellant's counsel adequate time to prepare for trial. Near the end of the hearing, there was also a brief discussion about trial strategy and deposition funding.

■ The first part of the hearing, which pertained to expert services and testimony, did not impair Appellant's right to self-representation because he had given his counsel control over those matters. As the Supreme Court stated in *McKaskle,* "[a] defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his defense." *McKaskle,* 465 U.S. at 182, 104 S.Ct. 944. As to the brief discussion concerning trial strategy and deposition funding, Appellant does not contend that he lost significant control over those issues. The point is denied.

## II.

■ Next, Appellant argues that the trial court erred in overruling his motion for new trial by denying him the right to counsel in the preparation of that motion. He alleges that he requested that appointed counsel assist him in preparing the motion, that the trial court approved the request, and that his counsel did not comply. These allegations, however, are refuted by the record. Although Appellant initially requested his counsel to draft a motion for new trial, Appellant had also been working on a draft of his own and decided later to write just one motion and to do it himself. When the trial court asked Appellant why he wanted appointed counsel to write a motion when he was planning on writing one himself, Appellant explained he was concerned about having adequate time. The trial court remedied this problem by giving Appellant extra time to file the motion, instead of having appointed counsel draft the motion. The point is denied.

## III.

■ Appellant contends the trial court erred because it "abdicated control" of in-court security measures to the Sheriff's Department of the City of St. Louis. In particular, Appellant argues that the trial court abused its discretion by 1) requiring Appellant to be shackled at trial, 2) requiring Appellant to wear prison uniforms, 3) providing extra security personnel, 4) allowing deputies to closely follow Appellant in the courtroom while he conducted his case, 5) allowing deputies to leave a gag and roll of masking tape on the first row of benches in view of the jury, and 6) requiring Appellant to use a 2–1/2 inch golf pencil instead of a regular pen or pencil. These measures, Appellant concludes, infringed on his right to the presumption of innocence and his right to self-representation.

The record does not support Appellant's claim. In the first place, the trial court can hardly be said to have "abdicated" control over court security. The trial court questioned Captain Ronald Miller of

the Sheriff's Department about the need for certain security measures, and after listening to Captain Miller's reasons, the trial court appears to have made an independent determination that the measures were in fact appropriate.

In addition, the challenges to the particular security measures, themselves, have no merit. The trial court has discretion to impose security measures necessary to maintain order and security in the courtroom. *State v. Kinder*, 942 S.W.2d 313, 330 (Mo. banc 1996). That discretion includes the use of restraints. *Id.* In this case, more security measures than usual were necessary because Appellant was charged with a brutal murder and had escaped confinement while awaiting trial. Although Appellant claimed the only reason he escaped was because of a "necessity," he never identified the necessity, and he admitted to the trial court that he would attempt to escape again if the same unnamed "necessity" arose. It is also relevant that Appellant was notified in advance about the security measures that would be taken and the jury was instructed not to consider them as an indication of guilt or dangerousness. In light of these facts, the trial court did not abuse its discretion in requiring Appellant to wear shackles and in requiring, or at least allowing, the deputies to accompany Appellant in the courtroom while conducting his case. These facts also support the requirement that Appellant use a 2-½ inch pencil, especially considering that the requirement was imposed on only one day of the ten-day trial, as the trial court observed when responding to Appellant's motion for new trial.

Appellant's allegation concerning the gag and roll of masking tape in view of the jury fares no better. He failed to object, and so his only recourse is for plain error review under Rule 30.20. To obtain plain error review, Appellant must demonstrate that the alleged error resulted in manifest injustice or a miscarriage of justice. *Id.* The record shows that the trial court did not notice the gag and masking tape at any time during the trial and that Appellant did not object to the presence of those items because he, himself, did not notice them initially. From these facts, there is little likelihood that the jury noticed the items, and therefore no manifest injustice or miscarriage of justice occurred.

The remaining allegations are also unsupported. Appellant fails to cite any evidence in the record that he was required to wear a prison uniform, nor does he cite any objection made to the court. In addition, Appellant fails to cite any evidence in the record that indicates how many security officers were in the courtroom, and he again fails to cite any objection made. In the absence of any evidence regarding these matters, there is no error.

## IV.

Appellant next contends that the trial court committed plain error by allowing Appellant to withdraw his motion to suppress the videotaped confession because the withdrawal was involuntary. Appellant explains that he would not have withdrawn the motion had it not been scheduled between 7:30 and 8:00 p.m. after a long day of voir dire. The dialogue between the Appellant and the trial court is as follows:

THE DEFENDANT: Yes, at this time, Your Honor, I would like to withdraw my motion to suppress the evidence, the videotape confession.

THE COURT: Now, have you had an opportunity to talk about this with your stand-by counsel?

THE DEFENDANT: I have made this decision based upon my strategic decision not to do that and I have not discussed it with my stand-by counsel, it's my sole choice to do so.

\* \* \*

THE COURT: Are you aware that such statements and materials have been

known to weigh heavily on the jurors' mind and could tip the scales against you when the jury decides whether it should vote guilty or not guilty, are you aware of that?

THE DEFENDANT: Yes, sir, I am.

THE COURT: Are you willing to accept the risk that this evidence will come in and be used by the jury against you and tip the scales against you?

THE DEFENDANT: Yes, sir, I am.

\* \* \*

THE COURT: Understanding that do you still wish to proceed in giving up your right not to have a suppression hearing at this time?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Do you feel that you have been coerced in this decision because it is now five minutes to eight and you've had a long day and you're tired?

THE DEFENDANT: No, Your Honor, I do not.

THE COURT: Okay, because you appear to be wide awake and alert to me but I wanted to check with you first. In that case then we are in recess until tomorrow morning at 10:15.

This record is unequivocal. The Appellant voluntarily withdrew his motion to suppress his videotaped confession. Moreover, Appellant did not object to the admission of the videotape at trial. Under these facts, there was no manifest injustice or miscarriage of justice that would justify plain error relief.

### V.

 Appellant argues that the trial court erred in denying Appellant's motion for a bill of particulars and in overruling his written objection to the denial of that motion. Under Rule 23.04, if the information fails to inform a criminal defendant of the particulars of the offense sufficiently to prepare his defense, the trial court may require or permit the filing of a bill of

particulars. However, if a motion for a bill of particulars fails to set forth the additional facts that are sought and there is no showing that defendant was prejudiced by the denial of the motion, the trial court did not err. *State v. Raines*, 748 S.W.2d 865, 869 (Mo.App.1988); *State v. Feeler*, 634 S.W.2d 484, 487 (Mo.App.1981). In this case, Appellant failed to identify the additional facts he sought, and he has not demonstrated that he was prejudiced by the court's denial of the motion. The point is denied.

### VI.

 Next, Appellant contends that the trial court erred by refusing to allow him to voir dire prospective jurors on whether the cost of housing Appellant for life would cause them to prefer the death penalty. Specifically, Appellant asked:

Going back to Ms. Wilkerson, would the thought of housing – if I were found guilty of the charge and you went into deliberations upon whether to punish me by death or by life in prison would the thought and the cost of housing me for the rest of my life tend to lean towards the imposition of the death penalty?

The trial court then sustained the state's objection to this question.

 It is well settled that the nature and extent of questioning on voir dire is within the discretion of the trial judge, and only a manifest abuse of discretion and a probability of prejudice to the defendant will justify reversal. *State v. Barton*, 998 S.W.2d 19, 25 (Mo. banc 1999). Trial courts may exclude questions that are marginally relevant or irrelevant to issues in the case, or questions that may confuse or mislead the venire members. *State v. Thompson*, 985 S.W.2d 779, 790 (Mo. banc 1999). In this regard, the economic cost of imposing a death sentence is irrelevant to any issue submitted to the jury. *State v. Weaver*, 912 S.W.2d 499, 519 (Mo. banc 1995). *See also State v. Clay*, 975 S.W.2d 121, 142 (Mo. banc 1998), *cert. denied* ——

U.S. ——, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999) (holding that counsel was not ineffective for failing to correct a venireperson's impression on the cost of the death penalty vs. the cost of incarceration, because that was not a proper matter for the jury to consider). Such a consideration is improper because "it does not reflect the properly considered circumstances of the crime or character of the individual." *Blair v. Armontrout*, 916 F.2d 1310, 1323 (8ᵗʰ Cir.1990). Thus, the trial court did not abuse its discretion in the case at hand by disallowing Appellant's question. The point is denied.

### VII.

◼ Appellant contends in his next point that the trial court plainly erred in denying his motions to preserve fingernail scrapings that were taken from the victim. This claim was not preserved for appeal because it was not raised in Appellant's motion for new trial. Rule 78.07. As noted, to obtain plain error relief, Appellant must demonstrate that the trial court's ruling resulted in manifest injustice or a miscarriage of justice. Rule 30.20. There was conflicting evidence as to whether any fingernail scrapings were actually preserved and/or whether Appellant was given a report that discussed the results of tests performed on the fingernails, but the trial court appears to have resolved the conflict in the state's favor. Although the state made no attempt to offer evidence regarding the scrapings at trial, Appellant argues that he was denied the opportunity to do so and that the scrapings might have shown that the victim fought with Rick Lacy, and not with Appellant, as if Lacy had been the only one doing the beating. From Appellant's own confession, however, he was actively involved in the beating by holding the victim down as the blows were delivered by Lacy. Whatever the evidence from the fingernail scrapings might have shown, the alleged failure to produce it to Appellant did not result in manifest injustice. Furthermore, even assuming the scrapings were destroyed and that they

were somehow exculpatory, there is no evidence that they were destroyed in bad faith, i.e., for the purpose of depriving the defendant of exculpatory evidence, and only then would the claim be actionable. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The point is denied.

### VIII.

Appellant argues that certain other evidence should not have been admitted at trial because it had not been disclosed during discovery.

### A.

◼ First, Appellant claims that the trial court erred by allowing the state's handwriting expert, William Storer, to testify in the guilt phase that a tremor was evident in some of the victim's last signatures. Appellant argues that the reference to the tremor (supposedly indicating nervousness or fright) should have been excluded because the state failed to disclose it before trial. Appellant acknowledges, however, that he did not raise this claim during his trial and that it was raised for the first time in his motion for new trial. As noted, to obtain plain error relief, Appellant must demonstrate manifest injustice or a miscarriage of justice. Rule 30.20. Here, Appellant has suffered no manifest injustice because he has not shown that earlier discovery would have caused him to act differently and would have affected the outcome of his trial. *State v. Mease*, 842 S.W.2d 98, 108 (Mo. banc 1992) ("the focus of a denial of discovery is whether there is a reasonable likelihood that denial of discovery affected the result of the trial."), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269. The point is denied.

### B.

◼ Next, Appellant asserts that the trial court erred by admitting certain testimony from the branch manager at Mrs.

Notter's bank. At trial, the witness testified that Mrs. Notter told her that she feared that Appellant would kill her. Appellant alleges that the state did not disclose this statement to him, and that he first learned of it when he deposed the witness on January 22, 1998, four days before trial. Although Appellant had been given a police report in which the witness told the police that she thought Mrs. Notter was afraid of Appellant, apparently the report did not state that Mrs. Notter was afraid that Appellant would kill her.

▮ Rule 25.03(A)(1) requires the disclosure of names and addresses of witnesses together with their written and recorded statements. This rule does not, however, require the state to disclose statements that are not written down or recorded. Because Ms. Braun's statement in question was not written down or recorded, there is no discovery violation. Furthermore, even if the state had been required to disclose the statement, Appellant has failed to demonstrate that earlier discovery would have caused him to act differently and would have affected the outcome of his trial. *State v. Mease*, 842 S.W.2d at 108. The point is denied.

### IX.

▮ In a related claim, Appellant argues that the testimony concerning Mrs. Notter's statement was inadmissible under the state of mind hearsay exception. He explains that 1) the exception is not "firmly rooted," and, therefore, the Sixth Amendment to the United States Constitution requires "particularized indicia of reliability" for the statement to be admissible, and 2) use of the exception requires a limiting instruction, which the trial court failed to give.

Whether the testimony was properly admitted under the state of mind exception need not be decided because it was independently admissible under the doctrine of curative admissibility. This Court's most recent recitation of the doctrine is found in *State v. Weaver*, 912 S.W.2d 499, 510 (Mo.

banc 1995), *cert. denied*, 519 U.S. 856, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996), which states, " '[w]here a defendant has injected an issue into the case, the state may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects.' " *Id.* (quoting *State v. Lingar*, 726 S.W.2d 728, 734–35 (Mo. banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987)). In the case at hand, Appellant elicited hearsay testimony during cross-examination of officer Regina Jordan, who related that Mrs. Notter stated that she had given her checkbook to Appellant. The purpose of this hearsay statement was to negate the state's theory of Appellant's motive by suggesting that Mrs. Notter willingly gave her checkbook to Appellant. In this situation, the doctrine of curative admissibility permits the admission of the hearsay statements to which the bank manager testified in order to show that Mrs. Notter gave the checkbook to Appellant for the different reason that she was afraid of him. Thus, the trial court did not err in admitting Ms. Braun's testimony. The point is denied.

### X.

▮ Appellant argues that the circuit court erred in overruling his objections to the prosecutor's penalty-phase closing argument, which allegedly gave the jury the impression that the death penalty was required if the jury found aggravating circumstances but did not find any mitigating circumstances. However, Appellant did not give this ground for his objection at trial. Even if that objection had been made, Appellant mischaracterizes the record. The prosecutor's comment was simply that Appellant had the burden to present mitigating evidence and that Appellant's evidence regarding mitigating factors was insufficient to offset the aggravating factors. Furthermore, even if the prosecution's argument was improper, reversal is appropriate only if it is established that the comment of which Appel-

lant complains had a "decisive effect on the jury's determination." *State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 1998), *cert. denied,* — U.S. ——, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999). In this case, the trial court gave an instruction that the jury did not have to impose the death sentence even if it did not find any mitigating circumstances. This instruction cured any possible misperception about the prosecutor's remarks. The point is denied.

## XI.

■■■ Under section 565.035.3, RSMo 1994, this Court is required to determine:

1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and

3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Having thoroughly reviewed the record, this Court is satisfied that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

Appellant does not dispute that the five statutory aggravating circumstances found by the jury were supported by the evidence. Those circumstances are: 1) that Appellant murdered the victim for the purpose of obtaining money or any other thing of monetary value from the victim, sec. 565.032.2(4), RSMo 1994; 2) that the murder of the victim involved depravity of mind and was outrageously and wantonly vile, horrible and inhuman, sec. 565.032.2(7), RSMo 1994; 3) that the victim was killed as a potential witness, sec. 565.032.2(12), RSMo 1994; 4) that the murder was committed while Appellant was engaged in the perpetration of robbery in the first degree, sec. 565.032.2(11),

RSMo 1994; and 5) that Appellant had one or more serious assaultive convictions, sec. 565.032.2(1), RSMo 1994. From this Court's review of the record, the evidence amply supports the statutory aggravators found by the jury.

Finally, the imposition of the death penalty in this case is neither excessive nor disproportionate. The strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Appellant's favor. Furthermore, this case is like many others where the death penalty has been imposed against defendants who have brutally murdered and robbed their victims. *See, e. g., State v. Jones,* 979 S.W.2d 171, 176 (Mo. banc 1998), *cert. denied,* — U.S. ——, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999); *State v. Barnett,* 980 S.W.2d 297, 301 (Mo. banc 1998), *cert. denied,* — U.S. ——, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999); *State v. Simmons,* 955 S.W.2d 752 (Mo. banc 1997), *cert. denied* 522 U.S. 1129, 118 S.Ct. 1081, 140 L.Ed. 139 (1998); *State v. Laws,* 661 S.W.2d 526 (Mo. banc 1983), *cert. denied* 467 U.S. 1210, 104 S.Ct. 2401 (1984); *State v. Gilmore,* 697 S.W.2d 172 (Mo. banc 1985), *cert. denied* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); *State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996), *cert. denied* 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997); *State v. Tokar,* 918 S.W.2d 753 (Mo. banc 1996), *cert. denied* 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996); *State v. Ramsey,* 864 S.W.2d 320, 337 (Mo. banc 1993), *cert. denied* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992), *cert. denied* 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992), *cert. denied* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

It also bears mention that Appellant has had anything but a crime-free past. The evidence showed that Appellant committed an armed robbery of a Stop 'N' Go service station on Highway 141 on November 28,

1993; that he committed an armed robbery of a Stop 'N' Go service station on LeMay Ferry in Mehlville in December of 1983; that he committed an armed robbery of a Seitz service station on South Broadway in St. Louis County; that he robbed a King Oil service station in Jonesboro, Missouri, three times; that he had repeatedly broken into homes and threatened people; and that on two occasions he stole items from his father's home and falsely reported the incidents as burglaries. The evidence also showed that in 1992 a corrections officer found forged documents in Appellant's cell that were designed to make it look like Appellant had enormous assets that were tied up in litigation in a probate court so that Appellant could convince other inmates to give him illegal narcotics on credit. Finally, the evidence showed that in addition to Appellant's escape from the St. Louis City Jail, noted above, he attempted an earlier escape from that same jail on or about July 25, 1995, by sawing on the bars to his cell.

## CONCLUSION

For the foregoing reasons, the judgment is affirmed.

PRICE, C.J., COVINGTON, WHITE, WOLFF and BENTON, JJ., and CROW, Special Judge, concur.

HOLSTEIN, J., not participating.