Donny **BENNARTZ**, Respondent,

v.

**CITY OF COLUMBIA, Missouri,** Appellant.

**No. WD 70457.**

Missouri Court of Appeals, Western District.

Dec. 22, 2009.

Robert J. Krehbiel, St. Louis, MO, for Appellant.

George S. Smith and Randall B. Johnston, Columbia, MO, for Respondent.

Before Division III: THOMAS H. NEWTON, Chief Judge, and MARK D. PFEIFFER and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

This is an appeal from a judgment of the Circuit Court of Boone County ("trial court") for respondent Donny Bennartz ("Bennartz") following a jury verdict awarding Bennartz $68,000. We reverse the judgment of the trial court dated September 9, 2008.

## Factual and Procedural Background[1]

In the fall of 1996 or 1997, Bennartz was hired by the City of Columbia ("City") to work as a water utility maintenance mechanic at City's water treatment plant. He was an at-will employee. For most of his tenure, his direct supervisor in the maintenance department was Lonnie Nichols ("Nichols"). The maintenance department was located across the street from the main water treatment plant. The water treatment plant operations department was located in the main plant building. Ed Fisher ("Fisher") was the chief operator. John Betz ("Betz") was the plant superintendent and was in charge of the operations department. He oversaw Fisher and, at least unofficially, oversaw Nichols and the maintenance department as well. There was also a manager of water operations, who supervised the entire water department, but was not officed at the plant. From the time he was hired, Bennartz intended to stay at the water plant for the rest of his career. He believed he had "the best job in the City of Columbia. It was a great place to work."

Sometime in 2003, the manager of water operations retired and the position became available. Betz applied for the position, but it was awarded to Floyd Turner ("Turner") instead. This upset Betz, who reportedly complained that, "[t]hey hired that nigger over me." Bennartz testified that, at roughly that time, Betz and Fisher steadily became more abusive to the plant workers. Betz and Fisher would use abusive and profane language on a daily basis, although apparently all of the employees at the plant admitted to using profanity regularly. Fisher would get angry and throw tools, although most of the workers testified that he never threw them at anyone.

Betz's and Fisher's hostility seemed to be directed especially toward the maintenance department. Betz did not feel that the maintenance department and Nichols as its supervisor were doing a good job. There was a sign-out sheet at the plant where the maintenance mechanics would

1. "In determining whether the evidence was sufficient to support the jury's verdict, we view the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences [that] conflict with the verdict." *Brenneke v. Dep't of Mo. VFW*, 984 S.W.2d 134, 137 (Mo.App. W.D.1998) (internal quotations omitted).

log their time spent away from the plant on water maintenance jobs, and several times when Bennartz and other maintenance workers would return to the plant, they would find "shopping," "personal business," "South Pump Station," "fag," or "Fucking off" written on the sign-out sheet. Bennartz and other maintenance workers also found voluntary resignation forms in their personal mailboxes, which they believed were placed there by Betz and Fisher. Betz also would follow Bennartz and other maintenance workers to their off-site jobs in disguise to see whether they were really working. He also once hid a tape recorder in one of the trucks in an attempt to catch the maintenance crew doing things other than their off-site jobs.

Betz was quite a movie buff and would, on a regular basis, quote movie lines and make references to movies that some of the water plant employees found to be threatening. These included:

He might wake up with a horse's head in his bed.

There could be an accident.

In the mob, they dispose of rats.

Revenge is a dish best served cold.

If you are going to shoot someone, do it, don't talk about it.

A true friend helps you hide the body.

He only understands a slap in the face or a slug from a .45.

Betz also made many other comments about the maintenance department in general, and Nichols in particular, that were hostile and profanity-laden and that the maintenance workers and Bennartz found abusive.

When overtime shifts at the water plant were available, the sign-up sheets were usually posted during the day shift, and any interested workers could sign up for the available overtime shifts. However, at some time, Betz and Fisher began posting the available overtime when they knew that the maintenance crew would be gone, or overtime shifts were otherwise offered first to the workers favored by Betz and Fisher. Bennartz claims that eight times over several years, he was forced to take less favorable overtime shifts. Still, Bennartz had more overtime than anyone else at the water plant.

Bennartz also testified that Betz drove by his house after hours and that he would sometimes sit in his car in front of Bennartz's house for up to thirty minutes. While Betz testified that his father lived very near Bennartz and he visited his father daily, Bennartz testified that Betz's actions were not explainable by his visiting his father but were rather further attempts to intimidate Bennartz.

Bennartz went to Turner several times to complain about Betz and Fisher from 2003 until the time when he left the water plant in April of 2005. Turner repeatedly failed to take any action with respect to Betz's and Fisher's behavior. In April, 2005, Bennartz applied for and was offered a position with City in its public works department. Although the position offered a greater hourly wage, it had less overtime available and virtually no opportunity for advancement, unlike at the water plant, where Bennartz had risen from the position of Maintenance One to Operator One and could realistically receive additional future promotions. Bennartz genuinely wanted to remain at the water plant, so before accepting the public works position, he made one more attempt to speak to Turner. This time, he told Turner he wanted to file a formal grievance against Betz (and possibly Fisher). Turner told Bennartz, "[y]ou know how John Betz is, and if you—if you file a grievance, things are just going to get worse." After that meeting, Bennartz returned to the water plant, where Betz had written on the

schedule board an appointment for "crying on Floyd's shoulder," referring to Bennartz and a coworker, Jeff Scronce, who accompanied Bennartz to the meeting with Turner. At that time, Bennartz accepted the position with public works and resigned from the water department.

On June 19, 2006, Bennartz filed his petition with the trial court against City and Betz individually for constructive discharge in violation of public policy, alleging that he was constructively discharged in retaliation for reporting the actions of his supervisors. He also alleged tortious interference with contract against Betz individually and requested punitive damages against both defendants. Both defendants filed motions for summary judgment alleging that Bennartz was not constructively discharged in that he was still employed with City and that he never filed a formal grievance. Defendants also alleged that City was protected by sovereign immunity from Bennartz's claims. The trial court denied the motions for summary judgment. A jury trial was held.

At the close of Bennartz's evidence, City filed a motion for directed verdict, again claiming sovereign immunity and also claiming that Bennartz had failed to make a submissible case as to constructive discharge in violation of public policy. City claimed that Bennartz failed to make a submissible case for any of the public-policy exceptions to the employment-at-will doctrine, that he failed to establish a causal connection between his alleged constructive discharge and his alleged whistleblowing, and that the evidence of his damages was too speculative. This motion was also denied.

City renewed its motion for a directed verdict at the close of all of the evidence on the same grounds as its previous motions, adding that Bennartz failed to establish any of the requirements for constructive discharge. This motion was also denied.

The jury returned a verdict against City in the amount of $68,000. The jury also found for Bennartz against Betz as an individual but assessed damages of zero dollars against Betz. Judgment was entered accordingly on September 9, 2008. On September 16, 2008, City filed a motion for judgment notwithstanding the verdict (JNOV), making the same arguments as it did in its motions for directed verdict. On September 19, 2008, the trial court made a docket entry that purported to set aside the judgment of September 9, as having been erroneously entered.[2] Neither party objected to the court's setting aside of the judgment, but Bennartz filed suggestions in opposition to City's motion for JNOV. The court did not rule on the motion, and City appeals from the September 9, 2008 judgment.

2. Rule 75.01 allows the trial court, within the thirty-day period following the entry of judgment, "after giving the parties an opportunity to be heard and for good cause, [to] vacate, reopen, correct, amend, or modify its judgment." In this case, the trial court *sua sponte* entered an order setting aside its judgment. It did not notify the parties that it was considering doing so, nor did it afford the parties an opportunity to be heard on the matter. The order appears as a handwritten docket entry, initialed by the trial judge. A formal typed order setting aside the judgment was never signed. There is no indication that the parties even knew the judgment had been set aside until City put together the record for appeal. Missouri law dictates that such actions by the trial court are either void or voidable. Although Bennartz, the aggrieved party, never objected to this action by the trial court, we find the violation of the Rule renders the order void. The parties agree, City appeals the judgment as though it had not been set aside, and we proceed as though the order setting aside the judgment is a nullity. *See, generally, Brockhoff v. Leary*, 711 S.W.2d 869, 870–72 (Mo. banc 1986).

## Standard of Review

In reviewing the trial court's denial of City's motion for JNOV, we review the record to see whether Bennartz made a submissible case. "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Brenneke v. Dep't of Mo. VFW*, 984 S.W.2d 134, 137 (Mo.App. W.D.1998) (internal quotations omitted). As noted above, "[i]n determining whether the evidence was sufficient to support the jury's verdict, we view the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences [that] conflict with the verdict." *Id.* "If the record contains probative facts which support the conclusion reached by the jury, we will affirm." *Id.* We review errors of law *de novo*. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996).

## Legal Analysis

An at-will employee, like Bennartz, who works for a governmental entity, has two high hurdles to clear before he can make a submissible case for common-law wrongful discharge. First, he must prove that his claim falls within an exception to the at-will employment doctrine, and then he must prove that his case falls within an exception to the government's sovereign immunity. Although Bennartz's claims may fall within an exception to the at-will employment doctrine, they do not fall within any exception to municipal sovereign immunity recognized by the courts of Missouri.

### A. The Common Law Public Policy Exception to the Employee At–Will Doctrine

Normally, at-will employees may be terminated with or without cause at any time. *See Brenneke*, 984 S.W.2d at 137. One exception is when an employee is terminated in violation of public policy. *Bell v. Dynamite Foods*, 969 S.W.2d 847, 852 (Mo.App. E.D.1998). This exception is narrow, however, and has been limited to four basic categories:

> (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim.

*Id.* (citing *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 873–75 (Mo.App. W.D. 1985)).

Bennartz's theory at trial was that he fell within the second exception, known as the whistleblower exception. To make a submissible whistleblower case, the plaintiff must submit evidence that establishes that the plaintiff reported a violation of law or "well-established and clearly mandated public policy" to his supervisors or to legal authorities, that the employer then discharged him, and that there is a direct causal connection between the protected activity (the whistleblowing) and the discharge. *Id.* The well-established and clearly mandated public policy cannot consist merely of any behavior that offends the plaintiff but has consistently been limited to activities that violate statutes, regulations, constitutional provisions, the common law, and codes of ethics. *See Boyle*, 700 S.W.2d at 871, 876.[3]

3. *Boyle* references *Ising v. Barnes Hospital,* 674 S.W.2d 623, 624–25 (Mo.App.1984),

Bennartz does not allege that he complained of any violations of statutes, regulations, constitutional provisions, common law, or codes of ethics; rather, he alleges that he complained of behavior which would violate a provision of the City Ordinances of Columbia. While Missouri has not recognized violations of city ordinances or municipal regulations to be declarations of public policy, other jurisdictions have. *See, e.g., Miracle v. Bell County Emergency Med. Servs.,* 237 S.W.3d 555 (Ky.Ct. App.2007) (ordinance of any political subdivision); *Jacob v. Nodak Mut. Ins. Co.,* 693 N.W.2d 604 (N.D.2005) (local law, regulation or rule); *Falcon v. Leger,* 62 Mass. App.Ct. 352, 816 N.E.2d 1010, 1019 (2004) (municipal law and ordinances governing public safety). These jurisdictions, however, have statutory authority expressly prohibiting retaliation for reporting violations of the local ordinances or rules, which Missouri does not have. *See, e.g.,* KY.REV. STAT. ANN. § 61.102 (LEXIS NEXIS 2009).

 Assuming we also hold that ordinances such as the one cited by Bennartz are declarations of public policy, Bennartz would next have to have established that he was discharged by City. Bennartz, who admittedly submitted a voluntary resignation form, claims that he did not resign but rather was constructively discharged. The public-policy exception to the at-will employment doctrine may be established with evidence of constructive discharge. *Bell,* 969 S.W.2d at 853. To present a submissible case for constructive discharge, Bennartz must show that in response to his whistleblowing, the City deliberately made the working conditions at the water treatment plant so intolerable that Bennartz was forced to quit his job. *Id.* In other words, Bennartz must show a direct causal

connection between his whistleblowing and his decision to resign.

While constructive discharge is generally demonstrated by retaliatory actions taken by the employer or its agent(s) after an employee engages in protected conduct, here there is little evidence of retaliation after the whistleblowing. The only evidence is that, upon returning from his meeting with Turner, Bennartz found a note on the scheduling board for an appointment to "cry[ ] on Floyd's shoulder." Although it is questionable whether this alone would be sufficient to demonstrate that City deliberately made working conditions intolerable in retaliation for Bennartz's whistleblowing, this case appears to be unique. It is not retaliatory conduct following the whistleblowing, but pervasive conduct leading up to Bennartz's whistleblowing, combined with Turner's apparent unwillingness to correct the situation and his warning to Bennartz that, if he filed a grievance, things would only get worse, that forms the direct causal connection between the whistleblowing and Bennartz's decision to resign.

City has always maintained that Bennartz cannot prove constructive discharge because he is still employed with City. Bennartz argues, however, that he was constructively demoted. Several federal courts have recognized constructive demotion and analyze it the same way as they do constructive discharge. *See Fenney v. Dakota, Minn. & E.R.R. Co.,* 327 F.3d 707, 717 (8th Cir.2003); *Simpson v. Borg–Warner Auto., Inc.,* 196 F.3d 873, 876 (7th Cir.1999); *Sharp v. City of Houston,* 164 F.3d 923, 933–34 (5th Cir.1999); *Harden v. Warner Amex Cable Commc'ns,* 642 F.Supp. 1080, 1095 (S.D.N.Y.1986). Although Bennartz is now making more

---

wherein the plaintiff complained that she was fired because she refused to sign a consent to take a polygraph and refused to waive claims

against the polygrapher, and the court found that no public policy exception existed.

money than he did when he was at the water department, and has always made more per hour than he did at the water department, he claims that he was constructively demoted because there is less opportunity for advancement in his new position.

We need not decide whether complaining of conduct that violated a city ordinance is protected conduct on the basis that an ordinance is a valid declaration of public policy. Nor do we need to decide that Bennartz's resignation was the direct result of his reporting the violations to Turner; that the conduct was sufficiently offensive that it forced Bennartz to quit his job; and that his new position with the City, where he is making more money but has less opportunity for advancement, constitutes a demotion. Bennartz was employed by the City, not by a non-governmental employer. Therefore, he must show that his constructive demotion falls within an exception to the City's sovereign immunity.

### B. Sovereign Immunity

A municipality has sovereign immunity from actions at common law tort in all but four cases: (1) where a plaintiff's injury arises from a public employee's negligent operation of a motor vehicle in the course of his employment (section 537.600.1(1)); (2) where the injury is caused by the dangerous condition of the municipality's property (section 537.600.1(2)); (3) where the injury is caused by the municipality performing a proprietary function as opposed to a governmental function (*State ex rel. Board of Trustees of the City of North Kansas City Memorial Hospital,* 843 S.W.2d 353, 358 (Mo. banc 1993)); and (4) to the extent the municipality has procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy (section

537.610). Bennartz alleges that his claims fall outside of City's sovereign immunity in that City's maintenance and operation of its water plant is a proprietary function and not a governmental one.

The determination of whether a particular function of a municipality is governmental or proprietary depends upon whether the function is "performed for the common good of all." *Parish v. Novus Equities Co.,* 231 S.W.3d 236, 242 (Mo.App. E.D.2007). "Acts performed by the municipality as an agent of the state, including the establishment and operation of schools and hospitals, the creation of municipal fire departments, and the exercise of legislative or judicial powers, have been found to be governmental functions." *Id.*

Proprietary functions, on the other hand, are those performed by the municipality for profit or for the special benefit of the municipality. *Aiello v. St. Louis Cmty. Coll. Dist.,* 830 S.W.2d 556, 558 (Mo.App. E.D.1992). These functions often involve the provision of services or conveniences to a municipality's own citizens. *Id.* The distinction between governmental functions and proprietary ones is often obscure, however, and many municipal actions have a dual function. *Gregg v. City of Kansas City,* 272 S.W.3d 353, 361 (Mo.App. W.D.2008). A city's operation of a water plant is a perfect example of an activity with such a dual function. To the extent that a municipality sells water to its citizens for profit, it is performing a proprietary function. *Junior Coll. Dist. of St. Louis v. City of St. Louis,* 149 S.W.3d 442, 448 (Mo. banc 2004). But when a municipality provides water for preventing or fighting fires, or for keeping the city sanitary and healthful, it performs a governmental function. *Lober v. Kansas City,* 74 S.W.2d 815, 823 (Mo.1934). The Supreme Court has expressly found that a city may

have "dual purpose[s]" in owning and operating a waterworks system. *Id.* at 821.

Bennartz initially argued that his claims are not barred by sovereign immunity because City provides water for profit and thus was engaged in a proprietary activity. City does not, in fact, make a profit from its provision of water to its residents; the water plant adjusts its rates with the goal of running at a zero balance after covering expenses and capital improvements. Bennartz now argues that even if the City does not provide water for profit, it does so as a special benefit and thus still falls under the proprietary-function exception. However, in determining whether a claim is barred by sovereign immunity, "the analysis focuses on the activity giving rise to the injury to determine whether the activity was an exercise of a governmental or a proprietary function." *N. Kansas City Mem'l Hosp.*, 843 S.W.2d at 358. Whether the *ultimate service* provided is governmental or proprietary is controlling for purposes of the application of sovereign immunity only if the service provided actually caused the alleged injury.

For example, in *Junior College District of St. Louis,* the college was purchasing water from the city, and the water that flooded the school "was not being used . . . to fight a fire or for another public purpose." 149 S.W.3d at 448. Thus, the city was engaged in a propriety function that directly caused injury, and sovereign immunity did not apply. *Id.* By contrast, in *Lober,* the city was acting in its governmental capacity when an employee failed to close a fire hydrant while flushing and cleaning the streets. 74 S.W.2d at 823. Thus, a claim by a business flooded as a result of the city employee's negligence was barred by sovereign immunity. *Id.* Similarly, in *Gregg,* the municipality was engaged in operating an airport, which is

primarily a proprietary function. 272 S.W.3d at 361. The surviving family members of a woman fatally shot by an off-duty airport security officer brought a wrongful death claim against the city. *Id.* at 356. Because this court found airport security to be a governmental activity, the city was protected from liability by sovereign immunity. *Id.* at 361.

Bennartz does not claim any injury arising out of Columbia's provision of water. Rather he claims that City's failure to act to correct Betz's and Fisher's behavior caused his working conditions to be so intolerable that he was forced to leave the water department in favor of other employment with City. Missouri courts have consistently held that "[p]ersonnel decisions and the internal administration of operating a municipal department are governmental," not proprietary functions. *Kunzie v. City of Olivette,* 184 S.W.3d 570, 574 (Mo. banc 2006). Therefore, claims of wrongful discharge and constructive discharge have consistently been found to be barred by sovereign immunity. *Id.* (sovereign immunity barred whistleblower claim for retaliatory discharge and wrongful termination in violation of public policy brought by former director of the municipal public works department and building commission); *State ex rel. Gallagher v. City of Kansas City,* 319 Mo. 705, 7 S.W.2d 357, 361 (1928) (The city's "Board of Fire and Water Commissioners, as well as all other heads of city governmental departments, in the matter of discharging or appointing an official or employee, cannot render the city responsible in any manner by reason of their wrongful acts," because they are acting "in the performance of the governmental functions."); *Nichols v. City of Kirksville,* 68 F.3d 245, 247–48 (8th Cir.1995) (Sovereign immunity barred a former municipal employee's claim for wrongful discharge even though he alleged

that in his job he performed proprietary duties that benefited the city and its citizens because, regardless of the nature of the work performed, "[h]iring and firing employees are governmental, not proprietary, activities.").

■ Bennartz argues that his constructive discharge for whistleblowing is not barred by sovereign immunity because the improper conduct of his supervisors could not possibly be "in furtherance of the common good." But employee misconduct, no matter how egregious, does not render actions that are otherwise governmental, proprietary. Case law is replete with appellate decisions dismissing or summarily disposing of claims based on alleged misconduct by municipal employees, even though in such cases all facts alleged by the plaintiff are assumed to be true.[4] If Bennartz's assertion were correct, no actionable conduct of any kind could ever fall within the protection of sovereign immunity. Bennartz cites no authority supporting his position. In fact, an examination of the common law leads to the opposite result, for sovereign immunity shields municipalities from liability even from intentional torts. *Aiello*, 830 S.W.2d at 558.

■ A review of Missouri constructive discharge cases where a municipality is the employer also leads to the conclusion that the bad conduct of supervisors or co-workers causing a plaintiff employee to resign does not turn a municipality's governmental functions into proprietary ones.

In *Aiello*, the plaintiff, an administrative assistant to the Vice–Chancellor of St. Louis Community College, refused to prepare her supervisor's expense reports because the supervisor was using taxpayer money to pay for personal leisure expenses. 830 S.W.2d at 557. The supervisor threatened her with termination, thereby forcing her to choose between committing a Class A misdemeanor by tampering with a public record or resigning her position. *Id.* Although the supervisor's actions in submitting the expense reports were, if the plaintiff's allegations were true, criminal in nature, the court held that the act of filling out an expense report was "a necessary incident to fulfillment" of the supervisor's role to "carry out the governmental mandate for education." *Id.* at 558–59. Such was a governmental function, and sovereign immunity prevented the plaintiff from maintaining her action for wrongful discharge. *Id.* at 559.[5]

Similarly, in *Topps v. City of Country Club Hills*, the plaintiff, a former City Clerk, reported " 'inappropriate and unethical business practices and violations of policies and procedures' " by the City of Country Club Hills. 272 S.W.3d 409, 412 (Mo.App. E.D.2008) (quoting *Topps v. City of Country Club Hills (Topps I)*, 236 S.W.3d 660, 660–61 (Mo.App. E.D.2007)). Not only did the city fail to correct the behaviors about which Ms. Topps complained, but the plaintiff claimed that, in retaliation for her whistleblowing, she was

---

4. *Aiello*, 830 S.W.2d at 558–59 (affirmed dismissal of wrongful discharge claim brought by whistleblower who reported her supervisor for filing fraudulent expense reports); *State ex rel. City of Nevada v. Bickel*, 267 S.W.3d 780, 783 (Mo.App. W.D.2008) (writ of prohibition issued after trial court denied city's summary judgment motion in a case alleging that a city inspector's failure to detect the faulty installation of an electric meter led to the electrocution of mobile home resident); *Wright v. City*

of Salisbury, 656 F.Supp.2d 1013, 1031 (E.D.Mo.2009) (summary judgment based on sovereign immunity granted against city police officer who claimed he was wrongfully terminated after complaining that he was instructed not to make drunk driving arrests).

5. The court also found that the Board of Trustees' failure to stop the alleged fraud was covered by sovereign immunity. *Id.* at 559.

"forced to resign" and was constructively discharged. *Id.* The court in that case held that the bad actions of the plaintiff's supervisors and coworkers, which caused Topps to resign her position, amounted to "'termination of a city employee'" and that such action was a governmental function protected by sovereign immunity. *Id.* at 414 (quoting *Kunzie,* 184 S.W.3d at 574).

■■■ The conduct of Bennartz's coworkers and his supervisor's acquiescence in the situation, although reprehensible, similarly do not change the governmental function of operating and managing a municipal department, *see Kunzie,* 184 S.W.3d at 574, into a proprietary one. "[N]egligent performance of a public function, even grossly negligent performance, [does not] make a governmental function proprietary." *Bickel,* 267 S.W.3d at 783. In many of the whistleblower cases cited above, the plaintiffs' supervisors knew about the alleged bad acts and either failed to correct them or affirmatively punished the plaintiffs for complaining.[6] Nothing about this case sufficiently distinguishes it from the line of cases above to warrant a different result.

We do note that this conclusion puts municipal employees at a distinct disadvantage as compared to other at-will employees in this regard. As the *Topps* court stated,

> Despite this finding, we are sympathetic to and understand the precarious position that well-intentioned and law-abiding municipal employees may face in cases involving whistle-blower retaliation.... Because of the sovereign immunity protection afforded to municipalities, municipal employees find themselves in a precarious and threatening situation, which creates a very

real potential for abuse by municipal governments. Municipal employees who have genuine concerns about the legality and propriety of their employer's acts know that, if they report the alleged wrongdoings, they risk losing their jobs and have no recourse. They are "second-class" employees with fewer rights and protections than employees in the private sector.

272 S.W.3d at 419. Our legislature has apparently found that this unfair burden on municipal employees is offset by the protection offered the public purse by protecting cities from bearing the cost of defending suits under the common law. Otherwise, municipalities might be seen by juries as having a "deeper pocket" than a wrongdoing municipal co-employee or a particular supervisor. Indeed, inconsistent verdicts in this case lead us to believe that this is precisely what happened at trial. The jury found against both the City and Betz, but assessed Betz, the primary offender, zero damages while it awarded damages against City in the amount of $68,000.

### Conclusion

Because Bennartz's injuries fall under none of the exceptions to City's sovereign immunity, we reverse the September 9, 2008 judgment of the trial court.

NEWTON, C.J., and PFEIFFER, J., concur.

PFEIFFER, J., writes a separate concurring opinion in which NEWTON, C.J., concurs.

MARK D. PFEIFFER, Judge, concurring.

I concur with Judge Mitchell's opinion. Given the current status of the law on

---

**6.** *See, e.g., Wright,* 656 F.Supp.2d at 1017–18; *Topps,* 236 S.W.3d at 661.

municipal sovereign immunity, the result reached today is correct. However, something is wrong when municipal employee discharge or demotion, constructive or otherwise, occurs in the context of intentional misconduct by the supervisory entity responsible for personnel decisions. Such intentional misconduct should never be deemed "actions benefiting the general public," *Junior Coll. Dist. of St. Louis v. City of St. Louis*, 149 S.W.3d 442, 447 (Mo. banc 2004), and should not, in my opinion, receive the shield of sovereign immunity. To do so turns the shield of sovereign immunity into a sword that promotes intentional misconduct by our city government officials instead of protecting our city government officials that make honest mistakes.

A jury of twelve residents of Boone County concluded [1] that Bennartz's City of Columbia co-employee referred to Bennartz as a "fag" and someone who "fucks off" at work; Bennartz's co-employee stalked Bennartz at his home, made death threats to Bennartz, and filled out voluntary resignation forms for Bennartz and placed the forms in Bennartz's personal mailbox in an intentional effort to force Bennartz to resign from the workplace.

Bennartz's co-employee referred to their mutual supervisor as a "nigger" and essentially dared Bennartz to "blow the whistle" to the supervisor, effectively predicting that the supervisor would do nothing about it. And, the jury concluded that Bennartz's co-employee was right. When Bennartz complained to the supervisor about this repulsive conduct on multiple occasions, the supervisor ignored Bennartz and sent Bennartz back into an arguably criminal environment. The jury concluded that Bennartz's supervisor's conduct constituted intentionally complicit misconduct. Bennartz's supervisor was enabling an environment of intentional hostility and abuse.

In sum, Bennartz alleged and proved to a Boone County jury that his co-employee engaged in intentional misconduct and the supervisor in charge of "personnel decisions" also engaged in intentional misconduct in fostering a work environment that led to Bennartz's constructive demotion.

Municipalities have immunity for actions undertaken as part of the municipal government's "governmental functions—actions **benefiting the general public.**" *Junior Coll. Dist. of St. Louis*, 149 S.W.3d at 447 (emphasis added). The Missouri Supreme Court has concluded that the "termination" of a city employee is a "governmental function." *State ex rel. Gallagher v. Kansas City*, 319 Mo. 705, 7 S.W.2d 357 (1928); *see also Kunzie v. City of Olivette*, 184 S.W.3d 570, 574 (Mo. banc 2006) ("Personnel decisions . . . are governmental").

However, our Missouri Supreme Court has only been faced with fact patterns in which there was an allegation of intentional misconduct by a co-employee. Our Missouri Supreme Court has not been faced with the fact pattern in which the supervisor or supervisory entity in charge of personnel decisions also engages in intentional misconduct leading to employee discharge or demotion, constructive or otherwise. The current case presents just such a fact pattern.

The fact pattern of this case begs the question: How can intentional misconduct by a municipality in exercising personnel decisions ever be deemed an "action[ ] benefiting the general public," such that this

---

1. This court reviews the facts in a light most favorable to the jury verdict. *State v. Armentrout*, 8 S.W.3d 99, 102 (Mo. banc 1999).

intentional misconduct should be deemed a "governmental function" entitled to immunity? This author respectfully argues that it should not.

However, multiple districts of the Missouri Court of Appeals have so found (as pointed out in Judge Mitchell's opinion), and we are bound by that precedent. I respectfully submit that it would benefit our state for our Missouri Supreme Court to address the issue of intentional misconduct by a municipality in exercising personnel decisions and the impact that such intentional misconduct has upon municipal immunity. Perhaps this is a case that our Missouri Supreme Court will earnestly consider when reviewing what I anticipate will soon be Bennartz's application for transfer to the Missouri Supreme Court.

NEWTON, C.J., concurs.