2005 ND 56

Steve JACOB and Donald Huck,
Plaintiffs and Appellants,

v.

NODAK MUTUAL INSURANCE COM-
PANY, Jon Livers, CEO, Keith Kin-
zler, President of the Board, and All
Other Members of the Board, Individ-
ually, and as CEO and Members of
the Board of Directors for Nodak Mu-
tual Insurance Company, Defendants
and Appellees,

and

Farm Bureau Life Insurance
Company, Defendant.

No. 20040197.

Supreme Court of North Dakota.

March 8, 2005.

Deborah J. Carpenter, Carpenter Law Offices, Bismarck, N.D., for plaintiffs and appellants.

Sarah Andrews Herman (argued) and Lynn Block (appeared), Dorsey & Whitney, Fargo, N.D., for defendants and appellees Nodak Mutual Insurance Company, Keith Kinzler, and Members of the Board of Directors.

Rebecca S. Thiem (argued) and Aaron K. Webb (on brief), Zuger Kirmis & Smith, Bismarck, N.D., for defendant and appellee Jon Livers.

KAPSNER, Justice.

[¶ 1] Steve Jacob and Donald Huck appeal from a judgment dismissing their claims against Nodak Mutual Insurance

Company ("Nodak"), Jon Livers, CEO, Keith Kinzler, President of the Board, and all other members of the Board, individually, and as CEO and members of the Board of Directors for Nodak Mutual Insurance Company and Farm Bureau Life Insurance Company, and from an order denying their motions for reconsideration or relief from the judgment. We affirm.

## I

[¶ 2] Jacob and Huck were employed by Nodak as two of six regional sales and training managers. On March 7, 2002, Nodak's Board of Directors adopted a motion to "accept the retirement offer of Jon M. Livers as Executive Vice President & CEO." On March 11, 2002, Nodak's Board of Directors adopted three motions: (1) to reconsider its acceptance of Livers' retirement; (2) to "amend the Main Motion to reject an offer of retirement from . . . Livers;" and (3) to "instruct President Kinzler to take an active role in the management of the Company for the purpose of advising the Board of Directors" and to "begin an investigation and advise the Board."

[¶ 3] On March 15, 2002, Kinzler issued memoranda to Jacob and Huck, stating, in part:

Please be advised that effective immediately you are placed on a paid leave of absence pending an investigation by appropriate Company officials into your actions as Regional Sales & Training Manager. This investigation will be undertaken immediately to determine whether you have engaged in a course of conduct that is not in the Company's best interest. In addition, this investigation will aid in determining whether you have violated any provisions of the employee handbook, your job descrip-

tion, or other Company guidelines and rules.

Upon receipt of this memo, you are not permitted to enter upon Company property, including your office. . . .

You will be advised as to your status in the near future and are instructed not to contact any Company Director, employee, officer, or agent pending further notification. Violation of the instructions in this memo will result in your immediate dismissal.

[¶ 4] In a letter of April 3, 2002, the attorney for Huck and Jacob advised the North Dakota Insurance Commissioner that "our firm has been retained by Donald Huck and Steve Jacob to represent them concerning the potential litigation arising from an 'investigation' being conducted by Nodak Mutual." The letter requested the Insurance Commissioner to advise the attorney "when it will be convenient for you to have me inspect and copy the records and documents pertaining to: 1) Your meetings with the Board, its legal counsel, or senior management since January 1, 2002; . . . 2) Corporate records on file with your department," and advised that "[w]hen we have this information, we will be in a better position to assess pursuit of our claims and complaints under the North Dakota Uniform Fair Trade Practices Act as embodied in N.D.C.C. 26.1–04." [1]

[¶ 5] On April 24, 2002, Nodak's Board of Directors resolved to terminate its six regional sales and training managers and its vice president of sales and training immediately. By letter of May 3, 2002, Nodak's attorney advised the attorney for Huck and Jacob, in part:

The information obtained through the investigation was presented to the Board of Directors. The investigation

---

**1.** Chapter 26.1–04, N.D.C.C., is entitled "Pro-    hibited Practices In Insurance Business."

revealed a number of reasons for concern regarding the company structure, particularly as it pertains to the management of our Career Producers. We believe that the current structure, including six managers over the Career Producers, has created significant inefficiencies, potential for miscommunication, and has created serious misunderstanding between the board, agents, and management. It has been an impediment to company initiatives regarding systems and risk management improvements, cooperation, and team work between our field and home office production and underwriting staff. It has improperly focused management energies on new sales rather than providing leadership which focused on optimizing profitability, persistency of renewals, and appropriate risk management in the current market. The Board of Directors has instructed Company management to restructure the Sales and Training Department to better meet the Company's current needs and goals.

As you likely know, all of Nodak's RSTMs [regional sales and training managers] became employed approximately two years ago. All are at will employees subject to the employment policies of Nodak Mutual. The Board has determined that the management structure involving six RSTMs is not appropriate. All of the current RSTMs will be terminated effective immediately. They will be continued for purposes of pay and benefits through May 15, 2002.... Although there is no notice or severance requirement under the policies of Nodak Mutual, your clients will specifically be offered the opportunity to receive a severance package equivalent to three months at their current compensation level. The severance package will be contingent upon their agreeing to sign a Confidential Release and Settlement Agreement with the Company.

[¶ 6] In a letter of June 19, 2002, the attorney for Huck and Jacob advised the North Dakota Insurance Commissioner: (1) "[t]his letter is to formally open the complaint process against Nodak Mutual for various and several violations of state law, policy, and court rulings;" (2) her clients' "firing and those of their fellow regional managers and state sales director were retaliation by the company for having raised the issue of their claims to your department, and also as an egregious power play in violation of the law;" and (3) of her view of the meaning and applicability of several subsections of N.D.C.C. § 26.1–04–03. The letter asserted "Nodak breached the policy of good faith and fair dealing ... committed the tort of 'outrage' ... discriminated against older workers," and "retaliated against my clients for whistleblowing to your department of the underhanded actions that were going on." The letter concluded by thanking the Insurance Commissioner "for any help you can provide in the formal filing of this complaint."

[¶ 7] Huck and Jacob sued, alleging six claims for relief, including the following age discrimination and retaliatory discharge assertions: "Plaintiffs were employees as defined by law in North Dakota Century Code Section 14–02.4–02 (North Dakota Human Rights Act), and both were over the age of 40 at the time of the adverse employer action" and the defendants' "actions in terminating Plaintiffs['] employment constitute a 'discriminatory practice' as defined in North Dakota Century Code Section 14–02.4–03, not only on the basis of age, but as retaliation for the Plaintiffs having engaged in protected activity."

[¶ 8] In a memorandum opinion ruling on the defendants' motions for summary

judgment, the trial court said, among other things:

> While six of the seven employees eliminated in the restructuring were over the age of 40, the other indicia to indicate age discrimination does not exist in the record. The plaintiffs have also put forth the argument that their challenge to the defendants' decision to terminate them reflected in communication with the North Dakota Insurance Commissioner was also a basis for retaliation by the defendant company. This assertion is, likewise, unsupported by the evidentiary record which has been compiled. . . .

> The alleged discriminatory and retaliatory actions alleged on the part of the company and its Board are not supported by the record. . . .

> The Court concludes that the record does not contain sufficient facts to withstand the summary judgment motion. The defendant insurance company, through its Board, had the authority to restructure and to eliminate positions if it determined doing so was in its best interests. The evidence does not lead to a conclusion that i[t] conjured up a basis for termination of the plaintiffs and other employees in their classification because the positions were somehow protected contractually or otherwise. The record falls short of establishing a discriminatory purpose of any kind in the terminations, in spite of the "hard feelings" which may have existed between the various personalities involved.

The trial court also said, in part: "The record is desolate with regard to the contention that the Board was acting 'at the behest of Livers' in its decision to eliminate the plaintiffs' positions, or that Livers was somehow directly involved in bringing about the restructuring." Finally, the court said, in part, that "the plaintiffs have failed to marshal sufficient evidence to raise genuine issues of material facts, or in other cases have sought relief under legal theories which are simply inapplicable to the record, which should be dismissed as a matter of law." The court ordered dismissal of the age discrimination and retaliation claims:

> Sufficient indication of age discrimination does not exist in the record. Retaliation based on communications with the North Dakota Insurance Commissioner is, likewise, unsupported by the evidentiary records. Therefore, Plaintiffs' age discrimination claim and retaliation claims based on protected activity against Nodak Mutual are DISMISSED with prejudice.

The court also dismissed all the other claims made by Huck and Jacob. The judgment entered on April 7, 2004, dismissed all of the claims brought by Huck and Jacob and awarded Nodak costs and disbursements of $4,433.79.

[¶ 9] Huck and Jacob appealed, contending summary judgment was inappropriate, the trial court erred in denying pretrial motions and in dismissing their defamation claim, and the court erred in denying their postjudgment motions for relief from the judgment.

II

[¶ 10] We deem it necessary to address only the arguments about the age discrimination and retaliatory discharge claims.

[¶ 11] We recently reiterated our standard of review on appeal from a summary judgment:

> Summary judgment is a "procedural device for the prompt and expeditious disposition of a controversy without a trial if either party is entitled to judgment as a matter of law, and if no dispute exists as to either the material

facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result." If the issues in the case are such that resolution of any factual dispute will not alter the result, then summary judgment is appropriate under the law. We review appeals from summary judgment de novo.

(Internal citations omitted). The party seeking summary judgment has the burden of showing no genuine issue of material fact exists, and the party opposing the motion must present competent admissible evidence, not present in the pleadings, which raises an issue of material fact. *Black v. Abex Corp.*, 1999 ND 236, ¶ 23, 603 N.W.2d 182. "Summary judgment is appropriate against a party who fails to establish the existence of a factual dispute on an essential element of her claim and on which she will bear the burden of proof at trial." *Id.* *Tibert v. Slominski*, 2005 ND 34, ¶ 8, 692 N.W.2d 133.

### A

[¶ 12] Under N.D.C.C. § 14–02.4–03, "[i]t is a discriminatory practice for an employer ... to discharge an employee ... because of ... age." Section 14–02.4–02, N.D.C.C., defines "age" as meaning "at least forty years of age."

[¶ 13] When considering claims under the North Dakota Human Rights Act, we may look to federal interpretations of corresponding federal statutes for guidance. *Koehler v. County of Grand Forks*, 2003 ND 44, ¶ 12, 658 N.W.2d 741. "The ADEA is not a vehicle for reviewing the propriety of business decisions." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1426 (10th Cir.1993). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of discrimination under the North Dakota Human Rights Act, a plaintiff must prove: (1) membership in a protected class under the Act; (2) satisfactory performance of the duties of the position; (3) an adverse employment decision; and (4) others not in the protected class were treated more favorably. *Koehler*, at ¶ 13. If a plaintiff establishes a prima facie case of discrimination, "the burden of persuasion shifts to the employer to rebut the presumption of discrimination by proving by a preponderance of the evidence that its action was motivated by one or more legitimate, nondiscriminatory reasons." *Schweigert v. Provident Life Ins. Co.*, 503 N.W.2d 225, 229 (N.D.1993). A plaintiff must prove the discharge was unlawful discrimination and "may, but does not necessarily, prevail on the basis of the prima facie case combined with a finding of the incredibility of the defendant employer's proffered explanation for its employment decision." *Schuhmacher v. North Dakota Hosp. Ass'n*, 528 N.W.2d 374, 379 (N.D.1995).

[¶ 14] "The North Dakota Human Rights Act does not prohibit discharging employees who are over forty years old. It prohibits discharging employees over age forty *because of their age.*" *Schuhmacher*, 528 N.W.2d at 381. In *Hillesland v. Federal Land Bank Ass'n*, 407 N.W.2d 206, 215 (N.D.1987), Hillesland contended "his termination violated the provisions of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, and Chapter 14–02.4, N.D.C.C. The trial court concluded that Hillesland failed to raise a genuine issue of material fact on the age discrimination issue." This Court agreed with the following reasoning of the trial court:

Plaintiff's fifth claim is for age discrimination. Defendants' Motion for Summary Judgment should be granted

because plaintiff has been unable to demonstrate the capability of presenting a prima facie case that his discharge was based in whole or in part on his age and because, even were he able to do so, plaintiff has been unable to make the requisite showing of any concrete, specific evidentiary basis sufficient to create a material issue of fact that the legitimate business explanation of his discharge substantiated by defendants is pretextual. Plaintiff offers no proof of any age-conscientious statements, writings, policies or discriminatory actions by defendants to or about or with reference to himself or anyone else. He offers no statistical evidence from which any inference of age discrimination might be drawn. He points to no pattern of adverse treatment of older similarly situated employees. . . . His assertion of a prima facie case rests solely on the notion that he was replaced by a younger man. . . . Plaintiff simply has failed to offer any evidentiary showing which would support a jury finding of age discrimination, especially in the face of defendants' plainly articulated legitimate business explanation that plaintiff was discharged because of his involvement with the Westby Transaction.

*Id.* Thus, we have held that age alone, without other evidence, is insufficient to survive a motion for summary judgment in an age discrimination case. *See also Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 763 (8th Cir.1995) (in a reduction in an employer's work force, assumption of the plaintiff's duties by a younger person is not in itself enough to establish a prima facie case); *Haas v. Montgomery Ward & Co.,* 812 F.2d 1015, 1016 (6th Cir.1987) (a discharged employee's replacement by a younger worker is not sufficient to prove the discharge was on the basis of age).

■ [¶ 15] Huck testified in a deposition:

Q. And do you believe that you were terminated because of your age?

A. Do I feel that? Yes. As well as salary.

Q. And do you have any proof to support that claim?

A. Not at present, no.

Q. Did anyone tell you that you were being terminated because of your age?

A. No.

Q. Have you ever seen any documentation to suggest that you were terminated because of your age?

A. No.

Q. And you have not identified any documents which would support that claim?

A. No.

Q. Are you aware of any documents which would support that claim?

A. No.

Q. Have you been given any information orally by anyone which supports that claim?

A. What was that?

Q. Have you been given any information orally by any person which supports that claim?

A. No.

Jacob testified in a deposition:

Q. Do you believe that you were terminated because you're 42 years old?

A. I don't believe that's the number one reason, but I think, you know, it just gave them—well, in looking for reasons, I wouldn't say it's the number one reason, but it happens today in society. It happens. And according to my attorney, I have a right to just put it in.

Q. Did anyone tell you that you were being terminated because of your age?

A. No, and I don't know why they would do that in this day and age.

Q. Do you have any evidence to support that claim?

A. No, I don't.

[¶ 16] Thus, Huck and Jacob acknowledged they had no proof, other than age alone, of age discrimination. We conclude the information available to the trial court precluded the existence of a genuine issue of material fact about Huck's and Jacob's claims that they were terminated because of age and entitled the defendants to summary judgment on that claim as a matter of law.

B

[¶ 17] Huck and Jacob have claimed they were terminated in retaliation for reporting violations of law to the North Dakota Insurance Commissioner.

[¶ 18] Sections 14–02.4–01 and 14–02.4–03, N.D.C.C., declare a policy against discrimination and prohibit discharging an employee for "participation in lawful activity off the employer's premises during nonworking hours which is not in direct conflict with the essential business-related interests of the employer." Section 14–02.4–18, N.D.C.C., provides, in part, that it is a discriminatory practice to conceal, help, cause or facilitate discrimination or reprisal "against a person by reason of . . . participation in lawful activity off the employer's premises during nonworking hours." Section 34–01–20(1), N.D.C.C., provides in part: "An employer may not discharge . . . an employee . . . because . . . [t]he employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule to an employer, a governmental body, or a law enforcement official."

[¶ 19] "To establish a prima facie case for retaliatory discharge under N.D.C.C. § 34–01–20(1)," a plaintiff must show he or she "engaged in protected activity and that activity was causally related" to his or her termination. *Dahlberg v. Lutheran Soc. Servs. of North Dakota*, 2001 ND 73, ¶ 35, 625 N.W.2d 241. Section 34–01–20, N.D.C.C., prohibits an employer from discharging an employee for reporting illegalities. *Dahlberg*, at ¶ 38. Section 34–01–20, N.D.C.C., requires "a 'report' to be made for the purpose of blowing the whistle to expose an illegality, and the reporter's purpose must be assessed at the time the report is made." *Id.* In *Jose v. Norwest Bank N.D., NA,* 1999 ND 175, ¶ 18, 599 N.W.2d 293, we said N.D.C.C. § 14–02.4–03 does not present "a clear public policy against retaliatory discharge for participating in an internal investigation of other employees' job performances." The plaintiffs in *Jose* "invite[d] us to create a public policy exception forbidding retaliatory discharge for participating in internal employee investigations." *Jose*, at ¶ 21. "We decline[d] to do so." *Id.* Because the plaintiffs in *Jose* "have defined no clear public policy which their removal violates, *see* N.D.C.C. 34–01–20, we conclude the trial court did not err in rejecting their wrongful termination claim." *Id.*

[¶ 20] For their retaliatory discharge claims based on the protected activity of reporting illegalities to the North Dakota Insurance Commissioner, Huck and Jacob rely on two letters their attorney sent to the Insurance Commissioner on April 3 and June 19, 2002. By letter of May 3, 2002, Nodak's attorney advised the attorney for Huck and Jacob that they "will be terminated effective immediately" but "will be continued for purposes of pay and benefits through May 15, 2002." Thus, the June 19, 2002, letter

from the attorney for Huck and Jacob to the Insurance Commissioner could not have led to a retaliatory discharge of Huck and Jacob. We will, therefore, not further address that letter. In her April 3, 2002, letter to the North Dakota Insurance Commissioner, the attorney for Huck and Jacob advised the Insurance Commissioner that her clients had been placed on leave pending a company investigation, requested inspection and copying of records and documents, and said, "[w]hen we have this information, we will be in a better position to assess pursuit of our claims and complaints under the North Dakota Uniform Fair Trade Practices Act as embodied in N.D.C.C. 26.1–04." The letter does not specify any law alleged to have been violated and relates only to Nodak Mutual's internal investigation. Under *Dahlberg* and *Jose*, the letter does not qualify as protected activity.

[¶ 21] We conclude the information available to the trial court precluded the existence of a genuine issue of material fact about Huck's and Jacob's claims that their terminations were retaliatory discharges for engaging in protected activities.

### III

[¶ 22] As to the other claims asserted by Jacob and Huck, they have failed to demonstrate the record contains any evidence supporting their claims or raising an issue of material fact.

> The resisting party must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact.

*Investors Real Estate Trust Properties v. Terra Pacific Midwest*, 2004 ND 167, ¶ 5, 686 N.W.2d 140. We thus conclude they are without merit.

### IV

[¶ 23] Affirmed.

[¶ 24] GERALD W. VANDE WALLE, C.J., and DALE V. SANDSTROM, and WILLIAM A. NEUMANN, JJ., and WILLIAM F. HODNY, S.J., concur.

[¶ 25] The Honorable WILLIAM F. HODNY, S.J., sitting in place of MARING, J., disqualified.