2009 ND 59

**George A. ELLIS, Plaintiff and Appellee**

v.

**NORTH DAKOTA STATE UNIVERSITY, Defendant and Appellant.**

**No. 20070005.**

Supreme Court of North Dakota.

April 9, 2009.

Thomas D. Fiebiger (argued), Fargo, ND, and Patricia R. Monson (on brief), Minneapolis, MN, for plaintiff and appellee.

Tag Christian Anderson, Assistant Attorney General, Office of Attorney General, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] North Dakota State University ("NDSU") appealed from a district court judgment finding NDSU engaged in age discrimination in terminating Ellis's employment and awarding him $256,206.16, which includes back pay, front pay, costs and disbursements, prejudgment interest, and attorney fees. After oral argument one of the Justices recused. The Court

ordered a rehearing. We conclude the district court erred in its standard of review and we reverse and remand for further proceedings.

## I

[¶ 2] In 1974, George Ellis began working as the sports information director for NDSU. On June 30, 2004, NDSU terminated Ellis from this position after 30 years of employment. Ellis was 59 years old at the time of his termination. As sports information director, Ellis's responsibilities included disseminating information to the media; preparing news releases; designing media guidebooks, game programs, and special publications; managing home and away events, tournaments, office administration; and compiling statistics and biographical information on athletes and coaches. Ellis was also the sports information director for the North Central Conference ("NCC") from 1972 to 1998.

[¶ 3] Ellis testified he received numerous national awards while working at NDSU, including induction into the College Sports Information Directors of America Hall of Fame and the NCC Hall of Fame. Ellis also received the Warren Bird Award for Outstanding Service in the Field of Sports Information. Ellis testified he received in excess of 135 national awards for publications he had designed, including 56 "best in the nation" awards. During his last two years at NDSU, Ellis received "best in the nation" awards for his football program cover and his basketball program and second in the nation for the football program. In about 1989, the sports information director responsibilities were divided between Ellis and Jeff Schwartz, after Schwartz was hired as the women's sports information director. Schwartz was 32 years old when he was hired.

[¶ 4] In July 2001, NDSU hired Gene Taylor as athletic director after the previous athletic director had resigned. Before Taylor was hired, Lynn Dorn, who was the women's athletic director, served as interim athletic director for approximately six months. While acting as interim athletic director, Dorn asked the athletic department employees to provide her with a list of accomplishments and goals. In spring 2001, Dorn met with Ellis. During this meeting, Dorn asked Ellis how old he was, what his retirement plans were, and if he was seeking other employment. Ellis testified that Dorn also asked if he had any retirement plans and told him to begin looking for other employment because NDSU was going to Division I status and he would not be part of their future plans. At that time, Ellis was in his mid-fifties and had no plans to retire. Dorn testified she made no similar inquiries of other athletic employees regarding their age or retirement plans. Upon Taylor's arrival as athletic director, he met with Dorn. Taylor testified that when he met with Dorn, she told him about frustrations that had been raised regarding the sports information department, including both the men's and women's sports information directors.

[¶ 5] During Taylor's second year at NDSU in 2002–2003, Taylor assigned Troy Goergen, assistant athletic director for marketing, to supervise Ellis and Schwartz in the sports information department. Goergen was in his late twenties at the time and had no prior experience working in the sports information department. Goergen was to be the "go-between" with the coaches and the sports information directors, including communications with the coaches if any of the sports information director deadlines were not met. Taylor also gave Goergen the responsibility of conducting performance evaluations of Ellis and Schwartz.

[¶ 6] Based upon continuing complaints from the men's head coaches and alleged deficiencies in Ellis's job performance, Taylor began the process to terminate Ellis in January 2004, speaking with NDSU's human resources director. According to Taylor, in addition to the dissatisfaction of men's head coaches, the grounds for Ellis's termination included Ellis's failure to meet several media guide deadlines and his absence from sports information department meetings. On April 29, 2004, Ellis was notified of his dismissal during a meeting with Taylor and Goergen.

[¶ 7] After Ellis's termination, the sports information department was reorganized in October 2004. Before Ellis's termination, the department consisted of four people: the men's sports information director, the women's sports information director, and two part-time graduate assistants. The reorganization resulted in a staff of five, with the addition of a third full-time position. Before the reorganization, Ellis was responsible for the men's sports, including football, basketball, wrestling, baseball, golf, track and field, and cross country. Schwartz was responsible for six women's sports. After the reorganization, Schwartz became the director of athletic media relations. The reorganization also included hiring a 26–year–old graduate assistant as assistant director of athletic media relations at an annual salary of $25,000, and another former graduate assistant who was 26 years old, as a new full-time athletic media relations assistant at an annual salary of $22,000 per year.

[¶ 8] As part of the department's reorganization, Schwartz was assigned football, women's basketball and women's softball; the assistant director of athletic media relations was assigned volleyball, men's basketball, and baseball; and the athletic media relations assistant was assigned soccer, cross country, and track and field. A

graduate assistant had responsibility for golf and wrestling. Testimony indicated this reorganization was structured in a manner that Ellis had suggested to Taylor on several occasions.

[¶ 9] After his termination, Ellis, with counsel, appealed his dismissal to NDSU's staff personnel board under Section 231 of NDSU's Policy Manual, and a hearing was held before the board. According to the combined notice of hearing, specifications of issues and pre-hearing order, the issue before the staff personnel board was whether Ellis's termination for cause was supported by a preponderance of the evidence. After a hearing on December 14, 2004, and January 25, 2005, the board concluded Ellis's termination was supported by a preponderance of the evidence.

[¶ 10] After exhausting his administrative remedies through NDSU's internal appeals process, Ellis commenced this lawsuit in district court against NDSU for violation of the North Dakota Human Rights Act, specifically alleging age and disability discrimination. Before trial, NDSU twice moved for summary judgment. The court denied NDSU's motions, concluding Ellis had offered evidence sufficient to establish a prima facie case of discrimination.

[¶ 11] After a bench trial in October 2006, the district court issued findings of fact, conclusions of law and order for judgment in favor of Ellis. The court concluded NDSU had intentionally discriminated against Ellis because of his age when it terminated his employment, but rejected Ellis's claims of discrimination based upon disability. The court also concluded NDSU was equitably estopped from asserting a statute of limitations defense and awarded damages to Ellis, including back pay, front pay, costs and disbursements, prejudgment interest and attorney fees. The order awarded Ellis back pay of

$55,883.66 from the date of the complaint was filed, two years of front pay in the amount of $98,861.26, plus attorney fees and costs and prejudgment interest.

[¶ 12] Ellis sought attorney fees and costs in the amount of $96,007.50, and the court awarded Ellis's fees and costs in the amount requested. On November 20, 2006, judgment was entered in favor of Ellis in the amount of $256,206.16.

II

[¶ 13] On appeal, NDSU argues Ellis's action was not commenced within the applicable statute of limitations. The district court, however, concluded equitable estoppel applied to toll the statute of limitations, and Ellis's initiation of the lawsuit was therefore timely.

■ [¶ 14] Generally, "[a]bsent valid service of process, even actual knowledge of the existence of a lawsuit is insufficient to effectuate personal jurisdiction over a defendant." *Muhammed v. Welch*, 2004 ND 46, ¶ 11, 675 N.W.2d 402; *see also Riemers v. State*, 2006 ND 162, ¶ 7, 718 N.W.2d 566.

[¶ 15] Under N.D.C.C. § 14–02.4–19 (2004), "[a]ny person claiming to be aggrieved by any discriminatory practice . . . in violation of this chapter may file a complaint of discriminatory practice with the department or may bring an action in the district court . . . within three hundred days of the alleged act of wrongdoing." Further, under N.D.C.C. § 32–12.2–04(5), a person bringing a legal action against the State must also deliver a copy of the summons and complaint to the director of the office of management and budget at the time the summons and complaint is served in the action.

[¶ 16] Here, NDSU terminated Ellis as sports information director on June 30, 2004. The parties do not dispute that Ellis personally served NDSU's president, Joseph Chapman, with a copy of the summons and complaint on April 29, 2005, two days after the 300–day statutory period expired. The district court, however, held NDSU was equitably estopped from asserting the statute of limitations defense based on the conduct of NDSU's general counsel.

[¶ 17] North Dakota has codified the doctrine of equitable estoppel in N.D.C.C. § 31–11–06:

> When a party, by that party's own declaration, act, or omission, intentionally and deliberately has led another to believe a particular thing true and to act upon such belief, that party shall not be permitted to falsify it in any litigation arising out of such declaration, act, or omission.

We have recognized that equitable estoppel may preclude the application of a statute of limitations by a party whose actions induce another party to not file a claim within a prescribed statutory period. *See Muhammed*, 2004 ND 46, ¶ 18, 675 N.W.2d 402; *Hoffner v. Johnson*, 2003 ND 79, ¶¶ 25–26, 660 N.W.2d 909; *Narum v. Faxx Foods, Inc.*, 1999 ND 45, ¶ 24, 590 N.W.2d 454.

■ [¶ 18] To prove equitable estoppel under N.D.C.C. § 31–11–06, the plaintiff must show: 1) the defendant made statements, and from the nature of the defendant's statements and all the surrounding facts and circumstances, the statements were made with the idea the plaintiff would rely on them; 2) the plaintiff relied on the defendant's representations or acts and, as a result of that reliance, the plaintiff failed to commence the action within the prescribed period; and 3) the defendant's acts giving rise to the assertion of estoppel must have occurred before the limitation period's expiration. *See Muhammed*, 2004 ND 46, ¶ 19, 675 N.W.2d

402; *Burr v. Trinity Med. Cent.*, 492 N.W.2d 904, 908 (N.D.1992).

[¶ 19] We have also explained that a false representation may occur where a party fails to disclose a material fact that the party is bound in good faith to reveal. *Muhammed*, 2004 ND 46, ¶ 20, 675 N.W.2d 402 (citing *Krueger v. St. Joseph's Hosp.*, 305 N.W.2d 18, 25 (N.D. 1981)). "For an estoppel to arise from silence, the silence must be accompanied by a duty to speak out, reasonable reliance on the silence, and resulting prejudice." *Muhammed*, at ¶ 20 (citing *Ray Co., Inc. v. Johnson*, 325 N.W.2d 250, 254 (N.D. 1982)). When the duty to disclose exists, the injured party need not demonstrate an affirmative deception in order to postpone the running of a statute of limitations. *Muhammed*, at ¶ 20 (citing *Snortland v. State*, 2000 ND 162, ¶ 15, 615 N.W.2d 574).

[¶ 20] Here, approximately 13 days before the 300–day statutory period had run, Ellis's counsel sent an e-mail correspondence to NDSU's general counsel stating, "This suit is ready to be commenced. Please let me know if you are willing to admit service on behalf of the University." NDSU's general counsel replied to the e-mail stating:

> Yes, I'd appreciate if you'd send it here. What I normally do, since it goes down to State Risk Management, and then to the AG, is send it to them and leave the date open so we don't have to ask for an extension right away as this usually takes a little time (about a week), if that is OK with you.

Ellis's counsel responded, "That's fine. I'll prepare an admission of service form and we'll send it out to you." The court found that Ellis's attorney sent the summons and complaint together with an original admission of service to NDSU's general counsel on April 13, 2005. At trial, NDSU's general counsel testified that he had the authority to accept service of process in the past. Although NDSU's general counsel testified that he thought service would be effectuated sometime in the future, the district court was not convinced.

[¶ 21] The district court found Ellis established that NDSU's general counsel made statements and the statements were made with the idea that Ellis would rely on them. The court found that if NDSU's general counsel had no plans to sign the admission of service within the one-week time stated in his e-mail response, he had a duty to speak in equity and good conscience. The court found Ellis had established that Ellis relied on the representations or acts of NDSU's general counsel and failed to commence the action within the 300–day period as a result of that reliance. The court found service would have been made if NDSU's general counsel had informed Ellis's counsel that he was not going to sign the admission of service. The court found the evidence was undisputed the acts giving rise to the assertion of estoppel occurred before the expiration of the limitations period.

[¶ 22] Although NDSU argues on appeal that it was not reasonable for Ellis to rely upon the e-mail communication as a promise to admit service within 13 days and that NDSU's general counsel did not engage in affirmative deception, the district court found NDSU's general counsel had an obligation to inform Ellis's counsel that he had no plans to sign the admission of service. Based upon the language of the e-mail correspondence, NDSU's general counsel left the impression that NDSU would admit service of process. The district court in applying equitable estoppel emphasizes that the delay was only two days and was induced by NDSU's general counsel's promise to admit service of the summons and complaint. We conclude the

district court did not clearly err in its findings.

[¶ 23] Based upon the district court's findings, we conclude the district court did not err in its application of equitable estoppel to toll the 300–day statute of limitations to hold Ellis's commencement of this suit was timely.

### III

[¶ 24] NDSU argues the district court erred in conducting a "de novo review" of Ellis's claims, ignoring the administrative decision and administrative record, and failing to apply administrative res judicata and collateral estoppel. NDSU essentially argues the court erred in conducting a trial on Ellis's claims under the North Dakota Human Rights Act, N.D.C.C. ch. 14–02.4. NDSU asserts the court should have reviewed the administrative decision of the staff personnel board under the deferential standard this Court set forth in *Peterson v. North Dakota Univ. Sys.*, 2004 ND 82, ¶ 14, 678 N.W.2d 163.

[¶ 25] Ellis asserts *Peterson* does not apply to this case because that case involved a substantive decision made by the North Dakota Board of Higher Education regarding a tenured faculty member. Ellis also argues NDSU failed to establish the essential elements of administrative res judicata and collateral estoppel in its motions to the district court on this issue.

[¶ 26] The district court found Ellis had exhausted his administrative remedies at NDSU before bringing this action. It is undisputed that Ellis was required to exhaust his administrative remedies. *See Brown v. State*, 2006 ND 60, ¶ 13, 711 N.W.2d 194 (applying exhaustion of remedies doctrine to a grievance between a student and a university); *Peterson*, 2004 ND 82, ¶ 14, 678 N.W.2d 163 (requiring dismissed faculty member to exhaust administrative remedies before bringing dis-

trict court action based upon breach of contract, wrongful discharge, and civil conspiracy); *Long v. Samson*, 1997 ND 174, ¶ 14, 568 N.W.2d 602 (holding dismissed professor's failure to exhaust administrative remedies precluded lawsuit).

[¶ 27] In *Peterson* the complaint was filed after the decision of the President of Bismarck State College to dismiss Peterson was appealed to the Board of Higher Education. The Board requested an administrative law judge to review the record made before the Standing Committee on Faculty Rights and make recommendations to the Board. The Board adopted the administrative law judge's recommendation and affirmed Peterson's dismissal. As we noted in *Peterson*, ¶ 9, n. 1, an appeal to the Board is not provided in the current policy manual and the decision of the president is final. The district court rejected the standard of review we adopted in *Peterson* because the hearing was before the staff personnel board, and the members of that board were all employees of NDSU appointed by the President. The district court then observed:

The Staff Personnel Board is not an agency of the state. Rather, it is a temporary entity appointed by the University President for a very limited duration and purpose. It has no semblance to the State Board of Higher Education. In *Peterson*, the court recognized the Board of Education is a constitutional body with full power and authority to appoint and remove professors of higher education institutions under its control. The court stated as follows:

Because the Board exercises constitutional powers, our review of its substantive decisions is akin to the review we employ when the doctrine of separation of powers applies. (Citation omitted).

The Staff Personnel Board, on the other hand, is not a constitutional body. The doctrine of separation of powers does not restrict judicial review of such a body. Therefore, the doctrine of separation of powers does not require this Court to restrict its review to that provided in appeals from an administrative agency. The Plaintiff is entitled to present his claim de novo before this District Court.

[¶ 28] NDSU asserts that the underlying administrative process cannot be rendered meaningless, and the district court should have reviewed the staff personnel board's decision under the principles of *Peterson*, rather than permitting a new trial on Ellis's age and disability discrimination claims under N.D.C.C. ch. 14-02.4. The issue is whether the district court erred in conducting a trial on Ellis's statutory cause of action or whether the district court was bound to review the prior proceedings under the standard set forth in *Peterson*.

[¶ 29] The district court's analysis of its understanding of the status of the staff personnel board and its analysis of our decision in *Peterson* does not consider applicable provisions of the State Constitution and statutes critical to that analysis.

[¶ 30] In 1938 the citizens of this State approved an amendment to the North Dakota Constitution establishing the State Board of Higher Education. That amendment, Article 54, now appears as Article VIII, § 6 of the North Dakota Constitution. It provides in part:

> The state board of higher education shall have full authority over the institutions under its control with the right, among its other powers, to prescribe, limit, or modify the courses offered at the several institutions. In furtherance of its powers, the state board of higher education shall have the power to delegate to its employees details of the administration of the institutions under its control. The said state board of higher education shall have full authority to organize or reorganize within constitutional and statutory limitations, the work of each institution under its control, and do each and everything necessary and proper for the efficient and economic administration of said state educational institutions.

N.D. Const. art. VIII, § 6(6)(b).

[¶ 31] Although subsection 8 of § 6 of Article VIII provides that the constitutional provision "shall be self-executing and shall become effective without the necessity of legislative action," this provision was "revised for clarity and brevity" and codified as § 15-1011 of the North Dakota Revised Code of 1943. *See* Code Revision Report Covering Work of The Code Revision Commission. The section remains codified in the North Dakota Century Code as § 15-10-11.

[¶ 32] The Board of Higher Education has, in furtherance of *its* powers, exercised *its* "power to delegate to its employees details of the administration of the institutions under its control," in this case, the authority to dismiss an employee. Contrary to the district court's analysis, we conclude the power delegated to and being exercised by the staff personnel board is the constitutional power and authority of the Board.

[¶ 33] Section 15-1017 was also adopted as part of the North Dakota Revised Code of 1943. That section provided in part:

> The state board of higher education has all the powers and shall perform all the duties necessary to the control and management of the institutions described in this chapter. In addition to the powers and duties specified in section 6 of arti-

cle VIII of the Constitution of North Dakota, the board may:

1. a. Appoint and remove the president or other faculty head, and the professors, instructors, teachers, officers, and other employees of the several institutions under its control....

[¶ 34] The quoted portion is one of several subsections of the statute. A lengthy "Reviser's Note" to this section states in part:

This section is a new section, being a composite of general powers and duties vested in and required of the several governing boards of the respective educational institutions now placed under the administration of the state board of higher education under N.D. Const. Art. 54, June 28, 1938; S.L.1939, p. 499.... In subs. 1 of this revised section, the power of removal is provided for.... It would appear that the general powers given to the state board of higher education in the constitutional amendment *would militate against a restricted power of removal.* (Emphasis added).

Section 15–1017 is now codified as N.D.C.C. § 15–10–17.

[¶ 35] In *Posin v. State Board of Higher Education,* 86 N.W.2d 31 (N.D.1957), this Court considered the judgment of the trial court denying a petition for writ of certiorari filed by faculty members of the North Dakota Agricultural College, now North Dakota State University, to review the action of the State Board of Higher Education in discharging them. In affirming the trial court's judgment denying the petition for writ of certiorari, this Court stated:

Article 54 of the North Dakota Constitution, the pertinent parts of which have been quoted, and the statutes enacted by the legislature with reference to the duties and powers of the Board, indicate that the Board has full authority over the institutions under its control. The power and authority of the Board to "elect and remove" is a legislative designation of one of its specific powers and is included in the "full authority" granted to it by the North Dakota Constitution.

*Id.* at 35.

[¶ 36] The authority to remove a faculty member and whether the Board breached a contract in exercising its authority to remove the faculty member may raise different issues, at least procedurally. *E.g., Hom v. State,* 459 N.W.2d 823 (N.D.1990) (failure to give notice as required by contract). In *Hom,* and the cases cited therein, we recognized that regulations adopted by the Board of Higher Education as part of its policy manual govern termination of faculty members and are part of the employment .contract between the institution and the faculty member. *Hom,* at 824. As a result, because adequate cause for dismissal is part of the contract terms, we have considered cases in which an action for wrongful discharge is brought claiming breach of contract because there was not adequate cause to discharge the faculty member. Thus, in *Peterson,* we analyzed the breach of contract claim under an appeal from a summary judgment, but, in so doing we said:

Nonetheless, recognizing the separation of powers doctrine, we conclude judicial review similar to that provided in appeals from administrative agency decisions is appropriate in this case. In reviewing factual findings from administrative agencies we have held, "we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of

the evidence." *See Power Fuels, Inc., v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979). *Peterson,* at ¶ 14.

[¶ 37] Assuming for purposes of discussion *Peterson* can be read to stand for the proposition that courts will try anew any action for wrongful discharge not based on a breach of contract involving the policies of the Board of Higher Education, causes of action in that case were based on tort theories. *Peterson,* at ¶¶ 26–27. Here, the cause of action is not based on a common law tort theory but rather on a legislative enactment, the North Dakota Human Rights Act, N.D.C.C. ch. 14–02.4.

[¶ 38] Assuming the action is not for a breach of contract and assuming it is akin to a tort, it nevertheless is a statutory cause of action which necessarily raises the issue of the power of the legislative branch to impinge on the constitutional authority of the Board. In Minnesota the Board of Regents is a constitutional body with powers akin to those of the Board of Higher Education. The Minnesota Court of Appeals held there was a distinction between a claim based upon a contract and one based upon a law establishing a state policy generally applicable to all employees and concluded the Minnesota Human Rights Act applied to the Board of Regents. *City of Minneapolis Comm'n on Civil Rights v. University of Minnesota,* 356 N.W.2d 841 (Minn.Ct.App.1984). The Minnesota Supreme Court has not directly considered the question but in *Winberg v. University of Minnesota,* 499 N.W.2d 799 (Minn.1993), the supreme court reversed the court of appeals holding that the veterans preference law applied to the University of Minnesota. While the reversal was based on the language of the statute and while the Minnesota Supreme Court acknowledged the decision of the court of appeals applying the Minnesota Human Rights Act to the University, the supreme

court in its opinion observed "[b]ecause we hold the Veterans Preference Act does not apply, *we need not consider again the extent to which the legislature can constitutionally control the University.*" *Id.* at 803 (emphasis added). In *Star Tribune Co. v. University of Minnesota Bd. of Regents,* 683 N.W.2d 274 (Minn.2004), a divided Minnesota Supreme Court held that its open meetings and data process statutes applied to the University of Minnesota and their application to the University did not infringe on the constitutional protections afforded the Board of Regents. But, unlike the case before us, that decision did not involve the authority of the Board of Regents to employ and discharge employees.

[¶ 39] The readily apparent rationale for unfettered judicial review is the underlying laudable purpose to provide relief to employees for the prohibited action of employers and the logical belief that such relief should be available to all employees regardless by whom they are employed. But, a laudable purpose and a logical belief have not been the standards by which we determine whether or not a legislative enactment violates the North Dakota Constitution. In light of *Peterson,* the Minnesota jurisprudence appears contrary to our jurisprudence. We are doubtful that a legislative enactment can supersede the constitutional authority of the Board of Higher Education to hire and discharge its employees, regardless of the laudable purpose for which the statute was enacted and regardless of the desire to apply the act to all employees.

[¶ 40] Furthermore, a contrary result raises several additional questions. For example, according to N.D.C.C. § 14–02.4–19, a person claiming discrimination under that chapter may bring an action in district court or file a complaint with the Division of Human Rights within the Department

of Labor. Under N.D.C.C. § 14–02.4–23 if a complaint is filed with the Department and not resolved, it goes to an administrative hearing under N.D.C.C. ch. 28–32, the Administrative Agencies Practice Act. Decisions under that chapter are reviewed by the courts under the deferential standard used in *Peterson*. If an employee of the Board can use this procedure because the matter was heard by an administrative agency, we would apply the same standard of review we applied to the determination of the Board of Higher Education in *Peterson*. Furthermore, N.D.C.C. § 14–02.4–20 provides a district court with broad discretion to impose appropriate relief upon an employer found liable for intentional discrimination under the Human Rights Act. Reinstatement is the typical remedy for unlawful employment discrimination. Could a court order reinstatement of an employee in light of the constitutional authority of the Board to appoint and remove faculty?

[¶ 41] These questions were not and need not be answered in this proceeding. The constitutional issue was not directly raised as an issue on appeal and, in addition to Minnesota, there is some authority that a legislature may enact provisions giving certain rights to the employees of institutions of higher education governed by boards with exclusive constitutional authority. *E.g., Regents of the University of Michigan v. Michigan Employment Relations Commission*, 389 Mich. 96, 204 N.W.2d 218 (Mich.1973) (employees have right to organize under Michigan Public Employees Relations Act but scope of bargaining may be limited if subject matter falls clearly within the educational sphere). Nevertheless, we construe statutes, if possible, in a manner to avoid constitutional infirmities. *Lawrence v. N.D. Workers Comp. Bur.*, 2000 ND 60, ¶ 19, 608 N.W.2d 254.

[¶ 42] Assuming the legislature can apply the Human Rights Act to employees of the Board of Higher Education, and recognizing the tension existing as a result of the constitutional authority of the Board, particularly when the cause for discharge of the faculty member is at issue, we conclude the standard of review in *Peterson* should apply in this proceeding. In *Peterson*, we stated that "to secure a review of a Board decision, a person adversely affected must bring a separate action in district court because there is no statute or rule providing an appeal to the district court similar to the appeal provided from administrative agency decisions." *Peterson*, at ¶ 13. That rationale is predicated on the contractual nature of the proceeding in that case and the other cases it cites in support of that holding. However, recognizing as we did in that decision, the separation of powers doctrine, the same standard of review should apply when the proceeding is based on statute. *Peterson* and our prior cases involve separation of powers between the executive and judicial branch. When the legislative branch intervenes through an enactment the separation of powers doctrine does not disappear. Separation of powers remains an issue but now it is between the three branches of government. Indeed, separation of powers issues are even more pointed when the authority of all three branches of government are in play.

[¶ 43] Furthermore, to conclude that a legislative enactment makes the issue of separation of powers disappear, a conclusion with which we do not agree, it would be an idle act to require a plaintiff to exhaust remedies through the internal appeals process when the results of that process have no significance in the court action. Exhaustion from remedies is not required under N.D.C.C. § 14–02.4–19 to begin an action.

[¶ 44] However, in balancing the constitutional authority of the Board to appoint and remove faculty, the constitutional authority of the legislature, and the constitutional limits of review by the judicial branch under the separation of powers concepts, we apply the *Peterson* procedure and standard of review to these proceedings under the Human Rights Act. This approach gives consideration to the authority of each of the constitutional entities. It recognizes the constitutional authority of the Board of Higher Education to remove faculty; it recognizes the constitutional authority of the legislative branch to enact laws generally for all citizens and it provides for review, although limited, by the judicial branch.

[¶ 45] Nor is this a novel approach. As noted above, the legislature in enacting the Human Rights Act already provides an administrative remedy by authorizing the filing of a complaint with the Division of Human Rights within the Labor Department as an alternative to filing an action in district court. N.D.C.C. § 14–02.4–19(2). Under that procedure if the complaint is not resolved, the department must "provide for an administrative hearing in the manner provided in chapter 28–32." N.D.C.C. § 14–02.4–23(3). If the department determines the respondent has engaged in a discriminatory practice under the Human Rights Act, many of the same remedies available to a court other than compensatory or punitive damages, are available to the department. N.D.C.C. § 14–02.4–20. The decision of the department, following a hearing held in the manner provided in N.D.C.C. ch. 28–32, is reviewed in the district court under N.D.C.C. § 28–32–46 and in this Court under N.D.C.C. § 28–32–49, with the standard of review being identical to that we set forth in *Peterson*, i.e., the standard applicable to appeals from administrative agencies. Thus, rather than totally disregarding the proceedings conducted under the policies of the Board of Higher Education and trying the case in district court as if those proceedings had never taken place, the procedure and standard of review we applied in *Peterson* appropriately balances the constitutional authority and power of the involved entities.

[¶ 46] We reverse the judgment and remand this matter to the district court to apply the *Peterson* standard of review to the record made during the institutional discharge proceedings.

[¶ 47] DALE V. SANDSTROM, and EVERETT NELS OLSON, S.J., concur.

[¶ 48] The Honorable LAWRENCE A. LeCLERC, S.J., sitting in place of CROTHERS, J., disqualified.

[¶ 49] The Honorable MARY MUEHLEN MARING disqualified herself subsequent to the first oral argument and did not participate in this decision.

[¶ 50] The Honorable EVERETT NELS OLSON, S.J., sitting in place of MARING, J., disqualified.

KAPSNER, Justice, dissenting.

[¶ 51] I respectfully dissent. I would affirm the district court judgment entered after a bench trial, finding NDSU engaged in age discrimination in terminating Ellis's employment and awarding Ellis damages, which included back pay, front pay, costs and disbursements, prejudgment interest, and attorney fees.

[¶ 52] Relying upon the constitutional authority of the Board of Higher Education ("Board") to hire and discharge its employees, the majority opinion concludes the district court erred by conducting a trial on Ellis's statutory cause of action under the North Dakota Human Rights Act, N.D.C.C. ch. 14–02.4. The majority

further concludes the district court was bound to review the prior proceedings before NDSU's staff personnel board under the "reasoning mind" standard this Court applied in *Peterson v. North Dakota Univ. Sys.*, 2004 ND 82, 678 N.W.2d 163. The majority concludes that, contrary to the district court's analysis, the power delegated to and exercised by the staff personnel board has the constitutional power and authority of the Board of Higher Education. The majority reasons that the Board "has, in furtherance of *its* powers, exercised *its* 'power to delegate to its employees details of the administration of the institutions under its control,' in this case, the authority to dismiss an employee." Majority, at ¶ 32; *see* N.D. Const. art. VIII, § 6(6)(b).

[¶ 53] The majority's expansive reading of the constitutional authority of the Board, however, fails to acknowledge that the Board is still subject to legislation. Article VIII, § 6(6)(b) of the North Dakota Constitution plainly states, in relevant part: "The said state board of higher education shall have full authority to organize or reorganize *within constitutional and statutory limitations*, the work of each institution under its control, and do each and everything necessary and proper for the efficient and economic administration of said state educational institutions." (Emphasis added.) Although the majority states that it is "doubtful that a legislative enactment can supersede the constitutional authority of the Board of Higher Education to hire and discharge its employees," Majority, at ¶ 39, this statement effectively eliminates the constitutional constraint that the Board's authority must be exercised "within statutory limitations." I do not believe the constitutional status of the Board can be interpreted to grant unfettered discretion in all employment matters. Here, the legislature in enacting the Human Rights Act does not "supersede" the Board's constitutional authority, but instead properly limits the Board's exercise of its discretion in employment decisions by defining and prohibiting discriminatory conduct. *See* N.D.C.C. § 14–02.4–03.

[¶ 54] The language of the Human Rights Act clearly indicates a broad scope in its intent to apply to all employers including the state itself, when acting as an employer. In so doing, N.D.C.C. § 14–02.4–01, states: "It is the policy of this state to prohibit discrimination on the basis of race, color, religion, sex, national origin, age, the presence of any mental or physical disability, ...; to prevent and eliminate discrimination in employment relations, ...; and to deter those who aid, abet, or induce discrimination or coerce others to discriminate." Section 14–02.4–03, N.D.C.C., provides, in relevant part, "It is a discriminatory practice for an employer to ... discharge an employee ... because of ... age."

[¶ 55] At the time of Ellis's termination in June 2004, "employee" was defined as "a person who performs services for an employer, who employs one or more individuals, for compensation, whether in the form of wages, salaries, commission, or otherwise .... [and] *does include* a person subject to the civil service or merit system or civil service laws of the state government, governmental agency, or a political subdivision." N.D.C.C. § 14–02.4–02(6) (2004) (emphasis added). "Employer" was defined as "a person within the state who employs one or more employees for more than one quarter of the year and a person wherever situated who employs one or more employees whose services are to be partially or wholly performed in the state." N.D.C.C. § 14–02.4–02(7) (2004). The term "person" is broadly defined to mean "an individual, partnership, association, corporation, limited liability company, un-

incorporated organization, mutual company, joint stock company, trust, agent, legal representative, trustee, trustee in bankruptcy, receiver, labor organization, *public body, public corporation, and the state and a political subdivision and agency thereof.*" N.D.C.C. § 14–02.4–02(12) (2004) (emphasis added).

[¶ 56] The broad definitions provided by the Human Rights Act provide a clear intent that the act is intended to apply to all employers, including the Board of Higher Education and its institutions. Even considering the special constitutional status of the Board, the Human Rights Act is such a statutory limitation contemplated by N.D. Const. art. VIII, § 6(6)(b). I believe the majority opinion is wrong in concluding that the Board is beyond the reach of the Legislature for purposes of creating a cause of action under the Human Rights Act. By broadly defining "employer" the Legislature intended to reach the Board and the institutions under its control.

[¶ 57] The majority correctly observes that under N.D.C.C. § 14–02.4–19, a person claiming to be aggrieved by a discriminatory practice may either bring an action in the district court or file a complaint with the Department of Labor. The majority then posits that under N.D.C.C. § 14–02.4–23, an unresolved complaint filed with the Department would go to an administrative hearing under N.D.C.C. ch. 28–32, which would then be reviewed by the courts under the deferential standard applied in *Peterson*. How the courts would review a complaint filed with the Department after an administrative hearing, however, is irrelevant, as the majority misses the point of N.D.C.C. § 14–02.4–19. Simply put, the Human Rights Act does not require an administrative proceeding, but allows any person claiming discrimination to choose whether to bring an action in the

district court or file a complaint with the Department of Labor. The majority opinion effectively forecloses that choice for employees of the university system by eliminating a court action under the Human Rights Act for those employees.

[¶ 58] Even more troubling is that administrative proceedings, either at the Department of Labor or, as in this case, at NDSU, would not provide the full measure of relief and protections a person may receive in pursuing an action under the Human Rights Act in the district court. The majority acknowledges as much when it states: "If the department determines the respondent has engaged in a discriminatory practice under the Human Rights Act, *many of the same remedies available to a court other than compensatory or punitive damages, are available to the department.* N.D.C.C. § 14–02.4–20." Majority, at ¶ 45 (emphasis added).

[¶ 59] By foreclosing a university system employee's ability even to choose to bring action in the district court, and limiting such an employee only to a deferential review by the courts, these employees are denied the full measure of relief and protections contemplated by the Legislature in enacting the Human Rights Act. This is inconsistent with the Human Rights Act's stated purpose "to prevent and eliminate discrimination in employment relations" and "deter those who aid, abet, or induce discrimination or coerce other to discriminate." How can the Board and its institutions claim insulation from the complete relief afforded by the Human Rights Act when the state itself does not claim such insulation?

[¶ 60] I do not believe that *Peterson*, 2004 ND 82, 678 N.W.2d 163 is controlling in this case. In *Peterson*, at ¶¶ 13–14, this Court concluded that a person adversely affected by a Board decision must bring a separate action in the district court to

secure review because there was not a statute or rule providing for an appeal to the district court. This Court then applied the deferential standard of review for Peterson's breach of contract claim. *Id.* However, here, because Ellis's action is based on an independent statutory cause of action under the Human Rights Act, the deferential standard articulated in *Peterson*, which applied to the terminated faculty member's breach of contract action, does not properly apply to Ellis's human rights claims.

[¶ 61] Whether the university system has discriminated under the Human Rights Act is not an "academic" decision, entitled to special protection based on the majority's concept of the Board's special constitutional autonomy. The Human Rights Act does not directly control the Board's discretion. It limits the exercise of the Board's discretion only to the extent the Board engages in defined discriminatory practices. To that extent only, the Human Rights Act provides a right to initiate action in the district court to obtain relief. The Act and cases decided under it allocate the burdens of proving a case and establishing defenses so that due deference is given to institutional actions that do not constitute discriminatory practices. *See Jacob v. Nodak Mut. Ins. Co.,* 2005 ND 56, ¶ 13, 693 N.W.2d 604 (reiterating framework for analyzing discriminatory treatment allegations and discussing *Schuhmacher v. North Dakota Hosp. Ass'n,* 528 N.W.2d 374, 379 (N.D.1995) and

*Schweigert v. Provident Life Ins. Co.,* 503 N.W.2d 225, 229 (N.D.1993)). The complexity of this examination is far more suited to the unfettered judicial process than to limited review under *Peterson.* The legislature has provided that option. N.D.C.C. § 14–02.4–19.

[¶ 62] By filing this action in the district court, Ellis was not seeking to secure appellate review of the NDSU staff personnel board's decision, but instead was litigating an independent statutory cause of action. Ellis was seeking the full measure of relief and protections provided to employees in the state under the Human Rights Act, including compensatory damages and attorney fees. The majority's conclusions are contrary to the clear legislative intent of the Human Rights Act and deprive employees of the university system the full measure of protection from discrimination prohibited under the Human Rights Act.

[¶ 63] I would affirm the district court's judgment entered after a bench trial because the district court's findings of fact are not clearly erroneous.

[¶ 64] LAWRENCE A. LeCLERC, S.J., agrees.